AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Eastern District of Louisiana

SEALED

| United States of America | ) | |
| v. | ) | Case No. |
| KURT E. MIX | ) | Magistrate No. 12-47-MAG |
| | ) | |
| | ) | |
| *Defendant(s)* | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of  October 4, 2010 & August 19, 2011  in the parish of _____ Orleans _____ in the

____ Eastern ____ District of _____ Louisiana _____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 18 U.S.C. Section 1512 (c)(1) (Obstruction of Justice) | The defendant did corruptly alter, destroy, mutilate, or conceal a record, document, or other object, or attempted to do so, with the intent to impair the object's integrity or availability for use in an official proceeding in the Eastern District of Louisiana, in violation of Title 18, United States Code, Section 1512 (c)(1). |

Fee _____
Process DS (3 CC USA )
X Dktd _____
___ CtRmDep _____
___ Doc. No. _____

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT.

☑ Continued on the attached sheet.

*Complainant's signature*

Barbara O'Donnell - Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____ 04/23/2012 _____

*Judge's signature*

City and state: _____ New Orleans, Louisiana _____

Lance M. Africk - United States District Judge
*Printed name and title*

## AFFIDAVIT

I , BARBARA O'DONNELL, being duly sworn, depose and state:

1.  I am a Special Agent with the Federal Bureau of Investigation ("FBI"), assigned to the New Orleans field office. I have been employed as a Special Agent for over twenty years and have participated in hundreds of investigations and arrests, including cases involving obstruction of justice. I am presently assigned to the Deepwater Horizon Task Force, based in New Orleans, Louisiana. The Task Force is investigating potential criminal activity related to the April 20, 2010 Macondo well explosions that resulted in the deaths of eleven men and the largest oil spill in United States history. Among the areas under investigation is whether BP plc ("BP") and/or individuals employed by BP violated any federal criminal laws by intentionally understating the amount of oil that was flowing from the Macondo well following the April 20, 2010 explosions.

2.  I am familiar with the circumstances of the offenses described in this affidavit through a combination of personal knowledge of the facts; discussions with other FBI Special Agents; discussions with other law enforcement and regulatory officials; and other investigative activities conducted and investigative materials obtained during the investigation.

3.  I make this affidavit in support of an application for issuance of an arrest warrant for KURT MIX for two counts of obstruction of justice in violation Title 18, United States Code, Section 1512(c)(1). This affidavit does not include all facts known to me, but rather contains facts sufficient to support the issuance of an arrest warrant.

4.  MIX was a BP Drilling and Completions Project Engineer who resigned from BP in or about January 2012. Following the Macondo well explosions, MIX worked within BP on a number of efforts to stop the flow of oil, including the unsuccessful Top Kill effort in May 2010. As a result, MIX generated and had access to BP internal data regarding the amount of oil flowing from the well after the explosions.

5.  As discussed in detail below, MIX deleted numerous electronic records relating to the *Deepwater Horizon* disaster response, including records concerning the amount of oil potentially flowing from the well, after being repeatedly informed of his obligation to maintain such records and after it became apparent that his electronic records were to be collected by an outside vendor retained by BP's counsel to collect electronic documents (the "VENDOR").

6.  Specifically, MIX deleted all of his text messages (hundreds in total) with: (1) BP's then-Drilling Engineering Manager for the Gulf of Mexico ("SUPERVISOR"), and (2) an outside contractor with whom MIX was working on the spill response ("CONTRACTOR"). Among the recovered information




MIX deleted includes real-time flow-rate analysis during the Top Kill operation indicating that Top Kill was not working, contrary to BP's public statements at that time.

7.      On the evening of April 20, 2010, the Deepwater Horizon rig, leased by BP, was completing work on the Macondo well in the Gulf of Mexico.  That evening, the rig experienced an uncontrolled blowout of gas and oil, which quickly led to two massive explosions.

8.      On or about April 21, 2010, the United States Coast Guard and the Minerals and Management Service commenced a joint investigation of the *Deepwater Horizon* disaster, resulting in the formation of a formal Marine Board of Investigation. Beginning in or about May 2010, the Marine Board of Investigation held formal hearings in the Eastern District of Louisiana and took testimony from various witnesses in regard to the disaster.

9.      On or about April 21, 2010, MIX began work modeling the potential flow rate from the leaking Macondo well, and shared his estimates, ranging from 64,000 barrels of oil per day ("BOPD") to 138,000 BOPD, with SUPERVISOR.

10.     On or about April 22, 2010, MIX received his first Legal Hold Notice, which alerted MIX to his obligation to retain all records relevant to the Macondo well incident and expressly included the obligation to preserve instant and text messaging documents.  That Legal Hold Notice also stated that "[w]ithholding, concealing, altering, falsifying or destroying anything subject to this Legal Hold Order may subject individuals or BP to prosecution or other severe consequences."  Over the following two months, MIX received five additional Legal Hold Notices, including one dated May 5, 2010, which stated on the cover in bold and underlined type that instant messages and text messages needed to be preserved.

11.     During the last week in April 2010, MIX exchanged by email various flow-rate-related data with other BP engineers (including SUPERVISOR), and with outside contractors (including CONTRACTOR), among others.  For example, on or about April 24, 2010, MIX emailed CONTRACTOR a document that included different flow-rate estimates ranging from 8,600 BOPD to 69,500 BOPD.  Likewise, on or about April 29, 2010, MIX sent to SUPERVISOR a series of flow-rate estimates based on complex modeling, which ranged from 1,000 BOPD to 146,000 BOPD.

12.     On or about May 18, 2010, a team of BP scientists (including MIX and SUPERVISOR) and others concluded that, although Top Kill could potentially be successful if the well was flowing oil at a rate of approximately 5,000 BOPD (BP's public estimate at that time), BP's internal data suggested that Top Kill was unlikely to succeed if the oil-flow rate was 15,000 BOPD or more.





13. On or about May 24, 2010, BP announced that Top Kill would start on the morning of May 26. Both BP's CEO and COO at the time publicly stated that day that Top Kill had a 60 to 70 percent chance of success.

14. On or about May 26, 2010 at about 10:25 p.m., at the end of the first day of the Top Kill effort, MIX texted SUPERVISOR :

    *Too much flowrate – over 15,000 and too large an orifice. Pumped over 12,800 bbl of mud today plus 5 separate bridging pills. Tired. Going home and getting ready for round three tomorrow.*

    As described below, MIX later deleted this text.

15. On or about May 28, 2010, BP continued publicly to state that Top Kill was broadly proceeding according to plan.

16. On or about May 29, 2010, BP terminated the Top Kill effort and publicly announced its failure. BP's stock price dropped approximately 15 percent on the next trading day.

17. On or about June 1, 2010, the Attorney General publicly announced that the Department of Justice ("DOJ") had launched a criminal investigation into the oil spill.

18. In August 2010, the U.S. Securities and Exchange Commission ("SEC"), in coordination with DOJ, submitted a subpoena to BP for all flow-rate related documents from April 20, 2010 to August 9, 2010. Both DOJ prosecutors and SEC attorneys were in frequent communication with BP regarding this and subsequent requests.

19. On or about September 22, 2010, MIX received an email from VENDOR notifying MIX that VENDOR would be collecting documents. The email sought to schedule a time with MIX to collect "all active electronic data." On or about September 27, 2010, MIX met with VENDOR, who retrieved some of MIX's relevant hardcopy documents.





20.     Based on forensic analysis of MIX's iPhone, on or about October 4 or October 5, 2010, MIX deleted his entire string of over 200 texts with SUPERVISOR. Most of these texts, including the text described paragraph 15 above, have been recovered using forensic tools, but some are still unrecoverable. On or about October 5, 2010, VENDOR first attempted to collect MIX's electronic documents remotely. That attempt failed and MIX's laptop was physically collected on or about October 20, 2010 by VENDOR and imaged for production to the government.

21.     On or about August 8, 2011, DOJ contacted MIX's criminal defense attorney to set up an interview of MIX. A federal criminal grand jury investigation of the matters as to which MIX was to be questioned was pending at the time in the Eastern District of Louisiana.

22.     On or about August 17, 2011, MIX was contacted by VENDOR to set up another document collection meeting and was informed of "possible collections (Laptop & PDA) for you." MIX responded that Monday, August 22 would work, but stated, "I need it returned for Tuesday the 23 for a meeting with my attorney."

23.     Forensic analysis has confirmed that, sometime between 11:54 a.m. on August 19, 2011, and 6:56 p.m. on August 20, 2011, all of the over 100 text messages between MIX and CONTRACTOR that were on MIX's iPhone at that time were deleted.

24.     On or about Monday, August 22, 2011, MIX's iPhone was collected by VENDOR and imaged.





25.     For the reasons explained above, I respectfully submit that there is probable cause
        to believe that (1) on or about October 4, 2010, and (2) again between on or about
        August 19, 2011 and August 20, 2011, MIX did knowingly and corruptly alter,
        destroy, mutilate, and conceal a record, document, or other object, and attempted
        to do so, with the intent to impair the object's integrity and availability for use in
        an official proceeding, in violation of 18 U.S.C. § 1512(c)(1).


                                        BARBARA O'DONNELL
                                        Special Agent
                                        Federal Bureau of Investigation


SWORN AND SUBSCRIBED
BEFORE ME THIS:
23rd Day of April 2012.

BY THE COURT:


HONORABLE LANCE M. AFRICK
United States District Judge
Eastern District of Louisiana