## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA                          CRIMINAL ACTION

VERSUS                                                      NO. 12-171

KURT E. MIX                                          SECTION "K"(1)


### ORDER AND REASONS

Before the Court is Defendant's Motion for Recusal (Doc. 720) .  Kurt Mix,  a former

drilling engineer for  BP, plc ("BP"),  whose defense is being paid for by BP[1], was convicted by

a jury on Wednesday, December 18, 2014, on Count 1 and acquitted on Count 2 of a two count

of a  Second Superseding Indictment for Obstruction of Justice (Rec.  Doc.  424)  brought by the

United States.  The charge on which Mr. Mix stands convicted stems from Mr. Mix's alleged

destruction of electronic data, i.e. text messages.  Some of the data was recovered and some was

not.  The Government contends that some of the data, both recovered and unrecovered, allegedly

concerned the flow rates estimated at the time of a failed effort to contain the flow of oil from the

Macondo well into the Gulf of Mexico as a result of the *Deepwater Horizon* drilling rig

explosion.  Thus, the central issue in this criminal case concerned whether Mr.  Mix subjectively

believed on October 4, 2010 that by virtue of these deletions he would impede a grand jury

investigation in the Easter District of Louisiana.

The instant defense Motion to Recuse was filed on January 22, 2014 by order of the Court.

The Court received a letter request for recusal on January 21, 2014 and held a telephonic

conference immediately thereafter.  These actions were taken because Counsel had learned "as a

---

[1]It is the Court's understanding based on communications that BP has agreed to pay for
Mr.  Mix's defense provided that he is acquitted on both counts.

result of an unsolicited disclosure of information by an unrelated third party," that the Undersigned[2] had "joined into and adopted the allegations made in Master Complaint 879" in the civil oil-spill lawsuit against BP ("MDL-2179"). The Undersigned's counsel had filed short form joinders in the MDL- 2179 which demanded both compensatory and punitive damages against BP.

Despite Mr. Mix's waiver with regard to this claim, counsel argues that recusal is now necessary, alleging that there are certain pleadings filed in that civil matter that are adverse to Mr. Mix's interest and "inflammatory" in nature in relation to his criminal matter because the pleadings contain allegations that  BP, through some of its officers and employees, disseminated "fraudulent flow rate" information.  Counsel contends that as a result of the Undersigned's "adoption" of those allegations in that separate, unrelated civil suit being tried before another judge, Mr. Mix is confronted with a previously "undisclosed" circumstance that creates an appearance of impropriety that Mr. Mix will not waive.   Moreover, Mr. Mix's counsel now contends that because of Mr. Mix's indictment, trial and conviction, the Undersigned, two of his relatives and two of his friends will profit.

Thus, counsel seeks this recusal based on two distinct statutes:

(1)      28 U.S.C. § 455(a) ("§ 455(a)") wherein a judge must recuse "where his impartiality might reasonably be questioned" and which basis for disqualification can be waived by the parties; and

---

[2]In this pleading, any reference to a claim(s) by the Undersigned or "the Court" by reference includes the claim(s) made by Janet Daley, the permanent law clerk to Judge Duval since he took the bench on October 31, 1994,  and his  wife since November 29, 2003.

(2)     28 U.S.C. § 455(b)(4) ("§ 455(b)(4)") wherein a judge must recuse if he has "a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding."  This basis cannot be waived by any party.

This motion has been filed despite:

(a)     this Court's immediate clear disclosure of its ownership of beachfront property on Grand Isle, Louisiana;

(b)     the clear disclosure that the Undersigned had a claim for the damages against BP as a result of the spill and might pursue the same;

(c)     the clear disclosure that the Undersigned must pursue the claim in an adversarial manner as the Undersigned,  as a judge, is prohibited under the terms of the BP settlement from pursuing these claims through the settlement claims procedure;

(d)     Counsel's unequivocal acknowledgment at a status conference that the issues in the *Mix* criminal matter had nothing to do with the civil litigation arising out of the Macondo/*Deepwater Horizon* disaster; and

(e)     Counsel's complete and unequivocal waiver of this civil/criminal factual intersection as a basis for recusal, and who so waived the conflicts  using a procedure that gave counsel a full week to investigate the nature of the claim in order to make an informed decision on waiver and employing a procedure such that the Court would never have been aware who had refused to waive the potential conflict.

3

Moreover, the Motion to Recuse was filed:

(a)     after numerous and consistent evidentiary rulings by the Undersigned in this criminal proceeding wherein the Government was specifically prohibited from introducing any evidence concerning any misconduct by BP;

(b)     after consistent rulings by the Undersigned that this case was not about "flow rate" *per se* but about obstruction of justice;

(c)     after Mr. Mix's counsel conducted a vigorous motion defense prior to and during trial;

(d)     after Mr. Mix's counsel and the Government were afforded three weeks to conduct the trial;

(e)     after Mr. Mix was **_acquitted_** by a jury of his peers on **one count** and found guilty on another;

(f)     after Mr. Mix's counsel filed two Motions for Acquittal and two Motions for New Trial which are currently pending;

(g)     after Mr. Mix's counsel conducted juror interviews which, contrary to the orders of this Court, delved into the deliberation process of the jury in this case and which are now subject of a sealed inquiry; and

(h)     after Mr. Mix's counsel subsequently filed "Defendant Kurt Mix's Rule 33 Motion for An Order Vacating the Jury's Verdict and Granting a New Trial Due to Juror Misconduct That Prejudiced Mr. Mix and Undermines the Verdict" memorializing counsel's potential misconduct therein.

For the reasons that follow, the Court finds:  (1) Mr. Mix made a knowing waiver of any potential conflict on June 5, 2012 which precludes this motion under § 455(a); (2) the new information does not create a disqualifying circumstance under either § 455(a) or (b) as it pertains to the Undersigned or  family or friends of the Undersigned.; and (3) the motion is untimely.  As such, the Court finds no merit in this Motion to Recuse.

**Statutory Standard for Recusal**

**I.      Section 455(a)**

Section 455(a) of Title 28 of the United States Code provides,  "[a]ny justice, judge or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."   The clear purpose of this rule is to protect against even the appearance of impropriety.  The United States Supreme Court in discussing this provision stated:

> If it would appear to a reasonable person that a judge has knowledge of facts that would give him an interest in the litigation then an appearance of partiality is created even though no actual partiality exists because the judge does not recall the facts, because the judge actually has no interest in the case or because the judge is pure in heart and incorruptible.

*Liljeberg v. Health Servs. Acquisition Corp.,* 486 U.S. 847, 860, 108 S. Ct. 2194, 2203 (1988) (failure of judge to recuse where he was trustee of university which had interest in litigation violated statute)  In *Sao Paulo State of the Federative Republic of Brazil v. American Tobacco Co., Inc.*  535 U.S. 229 (2002) (statute did not require recusal of judge whose name was added mistakenly and without his knowledge to a pro forma motion to file an amicus brief in a similar suit against some of the same defendants prior to his appointment to the bench),  the Supreme

Court amplified the meaning of this statement when it reversed the Fifth Circuit's decision concerning the mandatory recusal of Judge Barbier in the tobacco litigation further explicating the criteria for a section 455(a) analysis:

> The Fifth Circuit's decision is inconsistent with *Liljeberg v. Health Services Acquisition Corp.* 486 U.S. 847, 108 S. Ct. 2197, 100 L.Ed. 2d 855 (1988), which stated that § 455(a) **requires judicial recusal "if a reasonable person, *knowing all the circumstances*, would expect that the judge would have actual knowledge"** of his interest or bias in the case. *Id.,*at 861, 108 S. Ct. 2197 (internal quotation marks omitted and emphasis added).

*Sao Paolo State*, 535 U.S. at 233-34 (emphasis added).

"Although section 455 speaks in mandatory language, in actual application we have recognized that the decision to recuse is committed to the sound discretion of the district court and typically is reviewed for an abuse thereof.  But,'[i]f the question is a close one, the balance tips in favor of recusal.'"  *In re Chevron U.S.A., Inc.*, 121 F.3d 163, 165 (5th Cir. 1997) *citing Nichols v. Alley*, 71 F.3d 347, 352 (10th Cir. 1995).  Nonetheless,  it has also been recognized that the statute "'must not be so broadly construed that it becomes, in effect, presumptive, so that recusal is mandated upon the merest unsubstantiated suggestion of personal bias or prejudice.'"  *Nichols*, 71 F.3d at 351 *citing United States v. Cooley* , 1 F.3d 985, 993 (10th Cir. 1993).  The *Nichols* court continued:

> Neither is the statute intended to bestow veto power over judges or to be used as a **judge shopping device.**  *Greenspan*, 26 F.3d at 1006; *Cooley*, 1 F.3d at 993. Further, we are mindful that a judge has as strong a duty to sit when there is no legitimate reason to recuse as he does to recuse when the law and facts require. *Greenspan*, 26 F.3d at 1005; *In re American Ready Mix, Inc.*, 14 F.3d at 1501; *Hinnan*, 831 F.2d at 939.

*Id.*  (emphasis added).

It follows then that speculative allegations of potential bias are not sufficient to warrant recusal.  *See United States v. Miranne*, 688 F.2d 980 (5th Cir.  1982) (speculative nature of "potential bias" arising from judge's son being  attorney in lawsuit against a partnership in which criminal defendant had a small interest and where defendant had thought about bringing a civil action against son did not meet reasonable man standard of 455(a)).  As articulated by Judge Vance in *United States v. Henry*, 2008 WL 5146615, *2 (E.D.La. Dec.  5, 2008), "The Fifth Circuit has stated that a 'remote, contingent, or speculative' interest is not one 'which reasonably brings into question a judge's partiality.'"  *In re Billedaux*, 972 F.2d 104, 106 (5th Cir. 1992)(*quoting In re Drexel Burnham Lambert, Inc.*, 861 F2d 1307, 1313 (2nd Cir.  1988))."

Thus, as noted by the Fifth Circuit in the context of its review of a district court's decision:

> Courts have interpreted this statute to require recusal if a reasonable person, knowing all of the facts, would harbor doubts concerning the judge's impartiality. *Liljeberg v. Health Serv. Acquisition Corp.,* 486 U.S. 847, 860-61, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988). In conducting this review, we must ask how these facts would appear to a "well-informed, thoughtful and objective observer, rather than **the hypersensitive, cynical, and suspicious person.**" *U.S. v. Jordan,* 49 F.3d 152, 156 (5th Cir.1995). Moreover, courts should be cautious and discriminating in reviewing recusal motions. As the Seventh Circuit has noted:
>> A thoughtful observer understands that putting disqualification in the hands of a party, whose real fear may be that the judge will apply rather than disregard the law, could introduce a bias into adjudication. Thus the search is for a risk substantially out of the ordinary.
> *In re Mason,* 916 F.2d 384, 385-86 (7th Cir.1990), cited with approval in *Jordan,* 49 F.3d at 156.

*Sensley v. Albritton,* 385 F.3d 591, 599 (5th Cir. 2004) (emphasis added).   *See generally Berthelot v.  Boh Bros.  Const.  Co., L.L.C.*, 431 F. Supp.2d 639 (E.D.La.  2006), *mandamus denied*, *In re: Board of Commissioners of the Orleans Levee District; Washington Group International, Inc.,*

C.A. No. 06-30351 (5th Cir.  May 23, 2006) (Doc.  479 in C.A. 05-4182); *writ refused* (U.S. Dec.

11, 2006).

## II.  Section 455(b)(4)

Section 455(b) lists five circumstances the presence of which would require a judge to

recuse as these situations constitute "actual bias."  *See United States v. York*, 888 F2d 1050, 1053

(5th Cir.  1989).   Mr. Mix's counsel alleges that subsection (4) is implicated.  It provides:

(b) He shall also disqualify himself in the following circumstances:

(4)     He knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially effected by the outcome of the proceeding;

28 U.S.C. § 455(b)(4).

## III.  Section 455(e)

As to the grounds listed in §455() and (b),  § 455(e) provides the method by which

litigants may chose to waive certain grounds for disqualification.  It states:

(e)  No justice, judge, or magistrate judge shall accept from the parties to the proceeding a waiver of any ground for disqualification enumerated in subsection (b).  Where the ground for disqualification arises only under subsection (a), waiver may be accepted provided it is **preceded by a full disclosure on the record of the basis for disqualification.**

28 U.S.C. § 455(e) (emphasis added).  Unquestionably, then full disclosure is warranted and

required.

**IV.** **Timeliness**

Finally, a motion must be timely.  As stated by Judge Vance in the *Henry* case:

> Although the Fifth Circuit has not established a *per se* rule on timeliness "[t]he most egregious delay–the closest thing to *per se* untimeliness–occurs when a party already knows the facts purportedly showing an appearance of impropriety but waits until after an adverse decision has been made by the judge before rasing the issue of recusal." *United States v.  Stanford*, 157 F.3d 987, 988-89 (5th Cir.  1998); *See also Hirczy v. Hamilton,* No.  05-20213, 05-20348, 2006 WL 1816372 at \*3 (5th Cir.  6/29/2006) (stating that party "committed the worst type of delay by knowing facts that allegedly might lead to recusal but waiting until after he received an unfavorable ruling to file his motion to recuse").

*Henry*, 2008 WL 5146615 at \*1.  The Fifth Circuit provided an eloquent analysis of the pros and cons as to requiring a motion to recuse to be filed within a certain time frame, in *Delesdernier v. Porterie*, 666 F.2d 116 (5th Cir.  1982).  The appellate court ultimately found that timeliness may not be disregarded in all cases regarding disqualification under § 455(a).  In so doing, the appellate court discussed at length the reasons that timeliness might **not** be incorporated in a decision for disqualification of a judge; however, in finally opting to consider timeliness as a relevant consideration, it stated:

> Despite the force of these arguments, the lack of timeliness rule has its own problems.  If disqualification may be raised at any time, a lawyer is then encouraged to delay making a §455(a) motion as long as possible if he believes that there is any chance that he will win at trial.  If he loses, he can always claim the judge was disqualified and get a new trial.  This result would not comport well with the purposes behind § 455(a).

*Id.*  at 121.

As one commentator has put it cited by the *Delesdernier* court:

> The public is not likely to be convinced that a judge is any less biased merely because the facts that cast doubt upon his impartiality were not complained about until well into the proceeding.  On the other hand, it might legitimately be asked whether the spectacle of an attorney dragging his opponent through a long and

costly proceeding, only to conclude by moving for disqualification of the judge, is
not equally detrimental to public impressions of the judicial system.

*Id.* at 121 citing *Note, Disqualification of Federal Judges for Bias or Prejudice,* 46 U.Chi.Rev.

236, 263-64 n. 155.

    With this legal framework in mind, the Court will now analyze this motion in light of the
relevant facts.

**Facts and Analysis**

    **I.**    **Mr. Mix Waived His Right To Remove For Recusal Under Both §§ 455(a) and (b).**

        **A.**    **Disclosure was Immediate, Full, and Complete During the Telephonic Status Conference on May 31, 2012**

This case was transferred to this section of the Eastern District of Louisiana after another

section recused on May 15, 2012. The Undersigned is a Senior Status Judge and is entitled to

restrict his caseload in any manner he warrants. However, the Undersigned has not shirked any

difficult or high profile case, to date. Indeed, at the time the case was transferred, his docket

included and still includes *In re Katrina Consolidated Canal Breach Litigation*, C.A. No. 05-

4182. The final three week trial concerning the cause of the floodwall failures which caused the

catastrophic flooding in the Lower Ninth Ward ("*Armstrong* EBIA case") was to commence in the

fall of 2012, and indeed went to trial on September 10, 2012.[3] Based on the Undersigned's sense

---

    [3]Janet Daley had been assigned to the *Katrina* litigation since its inception and continues
on as such. However, during a hiatus in *Katrina* trial activity, she was assigned to the *Mix*
matter as it was an odd-numbered case which is her designated portion of the Undersigned's
docket. Per the Undersigned's order, she handed over clerking of this matter to the
Undersigned's other clerk, Stacy Bruton, some time in August of 2012, just as the *Armstrong*
EBIA trial was to commence. She resumed clerking this case around the retirement of Ms.

of responsibility to his colleagues and to the litigants to not be bounced from judge to judge, he opted to shoulder the burden of this trial which was scheduled to last for three weeks.

The Undersigned recognized (a) that he had a claim for the damages arising out of the ownership of the Grand Isle property and the effects of the spill and (b) that he could not participate in the *Deepwater Horizon* Court Supervised Settlement Program (which meant by definition his sole avenue for compensation was to file an independent complaint which would then be consolidated and controlled by the Case Management Orders entered in MDL-2179). Consequently, a telephonic status conference was called–telephonic because Joan McPhee and Michael McGovern for Mr. Mix, Derek Cohen for the United States, and Mark Filip for BP do not reside in New Orleans.

Participants in this conference were Richard Pickens and Derek Cohn for the United States; Walter Becker, Joan McPhee, and Michael McGovern for the defendant, Kurt E. Mix; and Ralph Capitelli, Brian Capitelli and Mark Filip for BP. BP at that time was a "movant" in the case as Mr. Mix was seeking to use documents subject to the attorney-client privilege of BP for his defense which documents he claimed were exculpatory; BP was unwilling to waive its privilege over them.

As memorialized in its May 31, 2012, Minute Entry (Doc. 46), described in its January 21, 2014 Order detailing the discussion held during the teleconference (Doc. 719)[4], corroborated by a contemporaneous e-mail written by Brian Capitelli on May 31, 2012 at 12:24 p.m., and

---

Bruton in mid-September of 2013, about one year later.

[4]The Court notes that in its haste to bring this issue to a head, that minute entry inverted § 455(a) and 455(b) references therein and shall order this error to be corrected.

attested to by Derek Cohen in a Declaration filed in conjunction with the United States' Response

to Defendant's Motion for Recusal (Doc. 736-1 and 736-2), the Undersigned disclosed that he

owns a beach house on Grand Isle that was affected by the oil spill, that he was precluded from

making a claim in the class action settlement, but could make a claim with the BP claims process,

even though to date had not made such a claim. **At no time, did this Court state that it would**

**relinquish this claim. In fact the Undersigned "indicated that he is precluded from making**

**a claim in the class action settlement, but can make a claim with the BP claims process."**

(Doc. 736-2, Contemporaneous e-mail of BP attorney Brian Capitelli) (emphasis added). At the

time, he simply had not made a final decision whether to pursue the claim. He also explained that

at the time his son worked at the Trust established as a result of the *Deepwater Horizon* Court

Supervised Settlement Program and that his duties included governmental affairs and the

handling of appeals.

The Court noted that it did not find that any of the disclosures implicated by the non-

waivable provisions of 28 U.S.C. §455(b). The Undersigned noted he had neither a direct interest

in the subject matter of this criminal proceeding, nor did he believe that his impartiality with

respect to the defendant might be reasonably questioned as prohibited by 28 U.S.C. §455(a).

(Doc. 46 at 2 of 3).

Next, as commemorated in detail by BP's own counsel:

Judge Duval indicated that he could decide one of three things one (sic): 1) that he
could recuse under Title 28 U.S.C. 455(a) based upon the potential appearance of
partiality; 2) send out a blind notice regarding the disclosures that he made and
allowing all the parties to move to have Judge Duval recused from the matter
without the judge ever being aware of which party moved for his recusal; or 3) he
could issue a notice in the record that he has made the disclosures and allow all of
the parties the opportunity to file a motion to recuse should any party see fit.

Judge Duval then opened up the conference for discussion. **Mike McGovern indicated that Mr. Mix was not involved with the Macondo well prior to the incident and he falls into the category of a "first responder". Based upon this McGovern indicated that the facts disclosed by Judge Duval did not involve the allegations in the indictment against Mr. Mix. McGovern indicated that he did not find any of the disclosures presented by the Court to require a recusal.**

(Doc. 736-2, Contemporaneous e-mail of BP attorney Brian Capitelli) (emphasis added)). The Government through Derek Cohen agreed with Mr. Mix's counsel that "in light of the 'narrow scope of this case,'" the Court's potential impartiality was not implicated here and recusal was not required noting that "the case does not involve the spill or Mr. Mix's response to the spill but pertains to the narrow facts surrounding Mix's deletion of text messages which prevent them from being presented to the grand jury." *Id.* BP's Mark Filip then commented that he did not see anything that would implicate the Undersigned's impartiality and that BP was not a party to the matter; however, he stated that he would like to report back to BP and get back to the Court. *Id.*

**B.      A Blind Recusal Method Was Used.**
**This Method Allowed Mr. Mix's Counsel  Seven Days to Investigate the Nature of the Property Damage Claim, the pleadings in MDL 2179 Which Clearly Included Punitive Damages.**
**Nonetheless,  Mr. Mix Waived "All Possible Grounds for Disqualification."**

As a result, the Court opted for its second option, a blind notice procedure pursuant to 28 U.S.C. 455(a) and ordered that after all counsel discuss the matter with their respective clients as to whether they desired to waive the possible grounds for disqualification that had been disclosed. After that attorney-client discussion, the Court ordered that by June 7, 2012, counsel would advise the Clerk of Court in writing as to whether waiver was desired. Thereafter, the Clerk of

Court was to advise the Undersigned as to whether or not the parties unanimously agreed on waiver, but in the event the decision was not unanimous, on no account should the identity of the responders and the substance of the response be disclosed. [5]

On June 4, 2012, under the signature of Derek Cohen, counsel for the Government, the United States submitted a letter as an express waiver of any possible grounds for disqualification based on the Court's factual disclosures made during the May 31, 2012 telephonic conference.

On June 5, 2012, under the signature of Joan McPhee, a letter was sent to the Clerk of Court which states in relevant part:

> We write on behalf of defendant Kurt Mix in response to Judge Duval's May 31, 2012 order directing the parties to advise the Clerk of Court whether they desire to waive the possible grounds for disqualification disclosed by the Court. **Mr. Mix hereby waives those *potential grounds* and has no objection to Judge Duval continuing to preside over this matter.**

(Doc. 763-3, Letter to Loretta Whyte signed by Joan McPhee, Counsel for Kurt Mix, dated June 5, 2012) (emphasis added). Clearly then, the fact that the Undersigned might pursue a claim had been disclosed and Ms. McPhee and her cohorts knew or should have known that such a claim included one for punitive damages.

Finally, on June 8, 2012 , BP waived the possible grounds for disqualification as disclosed by the Court. (See Exhibit A).

As to Mr. Mix, the above-described disclosures were made to practicing, licensed attorneys who are members of two large and highly prestigious firms. The Court clearly informed them that it had beach front property on Grand Isle which was widely seen during the crisis as the

---

[5]Because of the instant motion, the Government moved and Mr. Mix concurred that the wavier submissions be disclosed and have been made available to the parties and are hereby incorporated into the record as an exhibit to this order as Exhibit "A".

epicenter of the damage of the oil spill.  Indeed, the first place the President of the United States visited to survey the damage caused to the beaches, waterfowl, and fish of the Gulf of Mexico was Port Fourchon, Louisiana and then this small barrier island.  Thus, the parties were adequately informed that the beach in front of the Undersigned's home was soiled.  Also, it was public knowledge that the use of the beach was prohibited for a number of months and that earthmoving equipment–both mechanical and individuals–were used to clean up the spill.  Moreover, the parties were not forced to make a snap decision; they were given seven days to intelligently review the facts, determine whether waiver was in the best interest of their clients and then discuss this matter with their clients so as to arrive at an informed decision.

It is black letter law that a claim for punitive damages to property on land caused by a maritime accident is available under *Robins Dry Dock*.  Moreover, it is an elementary principle of tort law that a claim for punitive damages must be based on the willful or reckless disregard of the transgressing party–in this instance BP.  Additionally, it is a basic legal principle that a corporation can only act though its employees.  Mr. Mix was a BP employee and his job revolved around killing the flow from the Macondo well.  Clearly, then, the possibility that factual allegations surrounding fraudulent flow rate would be at issue in both the criminal suit and the civil suit.

This finding is supported with a cursory review of the MDL litigation website www.laed.uscourts.gov/OilSpill/Order/order.htm and the pleadings available there.  At the time of the disclosure,  Mr. Mix's counsel could have easily have reviewed the allegations made in that litigation, remembering that litigation was the only avenue available to the Undersigned to pursue his claim as had been disclosed.  The Undersigned is identified as belonging to the"B1 Bundle

Claimants" (Non-Governmental Economic Loss) in accordance with PTO No. 11 [CMO NO.1] Section III(B1) (Doc. 569, p. 3 of 14, in MDL-2179) who are those persons having damage or destruction to real or personal property, removal and/or clean-up costs and punitive damages. Indeed, in the Pretrial Order No. 11 the "bundle" is specifically described those claimants as having claims, *inter alia,* under *Robins Dry Dock*.

Moreover, punitive damages were alleged by claimants in MDL 2179 from its inception based on the alleged gross negligence, large-scale fraud and cover-up regarding flow rate and Top Kill and other various bad deeds of BP**.** This fact is unassailable in light of the Master Answer and Master Complaint (Doc. 879) filed on December 15, 2010 and the First Amended Master Answer to Complaint and the First Amended Complaint (Doc. 1128 in MDL 2179) filed on February 9, 2011 long before Mr. Mix had been indicted. The MDL court's ruling on the Motions to Dismiss the B1 Master Complaint, entered on **August 26, 2011,** would also have provided these attorneys even more explanation of the procedural history of those claims and claimants, the general maritime law, OPA and the punitive damage claims found viable by Judge Barbier again long before May of 2012. (MDL 2179, Doc. 3830)**.**

Thus, it is clear that from the moment this Court disclosed the existence of a claim, the fact that it did not intend to waive its claim, and that it would have to be pursued through litigation, Mr. Mix's counsel knew or should have known and were all put on notice that BP's allegedly wanton and willful acts, including the deception used as to flow rates– were at issue in MDL-2179. Moreover, if there were any appearance of impropriety that was waivable under §455(a), that appearance existed in full blossom on and before June 5, 2012, when Mr. Mix waived the "potential grounds" arising out of the Undersigned's claim against BP and stated

16

unequivocally that Mr. Mix had "no objection to Judge Duval continuing to preside over this matter."

Moreover, the Court discussed the non-waivable grounds for disqualification under §455(b) and noted that none were present.  Had Mr. Mix's counsel believed that because the Undersigned could pursue a punitive claim that somehow implicated a non-waivable basis under § 455(b), the time to do so was then.  It is beyond peradventure that a punitive damage claim against BP in the MDL would require proof of wanton, reckless and grossly negligent activity on the part of **BP.**  The Court's statement that none of provisions of § 455(b) were implicated meant precisely that the Undersigned did not think (and remains convinced) that the intersection of common facts in a criminal trial held after the close of evidence in a civil trial in another section of Court would in any way increase an award of punitive damages.

Counsel for Mr. Mix stated unequivocally during the conference that based on the facts disclosed by the Undersigned, none of those facts involved the allegations in the indictment against Mr. Mix and counsel  indicated that he did not find any of the disclosures presented by the Court to require a recusal.  Then, counsel for Mr. Mix had one solid week to research and analyze the disqualification issue.  The Court reiterates that the two law firms which fielded at least three lawyers who represented Mr. Mix and participated in this conference had sufficient time to examine the record in the MDL-2179.  Counsel for Mr. Mix  are not an uneducated, uninformed *pro se* plaintiffs; counsel knew or should have known that the alleged "willful and reckless misdeeds" of BP would be implicated in pursuing any claim that the Undersigned might make for damages to his property in Grand Isle.  Nonetheless, Joan McPhee sent a signed letter to the Clerk of Court for the Eastern District of Louisiana that stated that based on the "possible grounds for

17

disqualification disclosed by the Court.  Mr. Mix hereby waives those *potential grounds* and has

no objection to Judge Duval continuing to preside over this matter."  (Doc. 736-3 and attached

hereto).  These facts unequivocally demonstrate that there was a full disclosure on the record of

the basis for disqualification and Joan McPhee on behalf of her client Kurt Mix waived these

alleged grounds for disqualification.


II.    **Filing of Claim in MDL-2179 Did Not Create a "New" Basis for
       Disqualification As the Civil Liability of BP and the Criminal Conviction of
       Mr. Mix Remain Unrelated.**


A.    **MDL-2179 Has No Criminal Component and Mr. Mix is Not a Party to
      that Matter–Allegations Therein Have No Effect On Mr. Mix**

It is beyond peradventure that MDL-2179 is a huge undertaking by Judge Carl Barbier to

adjudicate the claims that have arisen as a result of the explosion of the *Deepwater Horizon* and

the resulting oil spill from the Macondo well.  As mentioned above, in order to stream-line that

litigation, the *Deepwater Horizon* court entered a number of Pretrial Orders and Case

Management Orders to attempt (1) to allow those who were entitled to proceed pursuant to the

settlement agreement to be compensated fairly and as quickly as possible through the *Deepwater

Horizon* Court Supervised Settlement Program, (2) to adjudicate the fault for the explosion of the

*Deepwater Horizon* which was tried under the rubric of Phase One and (3) to adjudicate in Phase

Two (I) the United States' claim under the Clean Water Act against BP for the spill and (ii) the

"Aligned Parties"[6] contentions against BP wherein they contended that BP had inadequately

_____

[6] These parties were Defendants Transocean Offshore Deepwater Drilling Inc.,
Transocean Deepwater Inc.  Transocean Holdings LLC, and Triton Asset Leasing GmbH,
Halliburton Energy Services, Inc., Plaintiffs,  the State of Alabama and the State of Louisiana.

prepared for the spill and had an inadequate response plan which was implemented inadequately. A subset of that argument included the contention that had BP been honest about the flow rate, those charged with the decision to approve Top Kill would have known that it was a vain and futile exercise, and the flow of oil would have been stopped 87 days earlier.  Proving these allegations by the Aligned Parties would result on the part of the Transocean Entities and Halliburton to be liable for a reduced percentage of the CWA fines and on the part of the plaintiffs, Louisiana and Alabama to increase their claim for punitive damages under the maritime law.

In addition, the *Deepwater Horizon* court required, through its orders, that Master Complaints for each "Bundle" of claimants as defined by the court be filed.  Individual plaintiffs could adopt the allegations of those Master Complaints if they fit within the definition of the bundle.  The MDL Court adopted the process and approved the forms which specifically state that by filing same one is adopting the allegations of the appropriate Master Complaint.  This streamlined the adjudication of this matter.  If a separate complaint were filed by a party, it would be joined in the MDL and stayed.  Moreover, the issues Mr. Mix's criminal case as explained herein concerned **his** state of mind at the time of the deletions **not** the state of mind of BP or any other of its employees.

> **B.      BP Pleaded Guilty and Attested to a Factual Basis Clearly Admitting
> to Having Pursued a Pattern of Fraudulent Representations to
> Congress and Governmental Entities**

Six months after Mr. Mix was initially indicted, on **November 11, 2012,** a fourteen count

Bill of Information was handed down in the Eastern District of Louisiana  against BP.   See

*United States v. BP Exploration and Production, Inc.,* Crim., No. 12-292, Doc.  1.  The Bill of

Information included eleven felony counts of seaman's manslaughter under 18 U.S.C. § 1115; one

misdemeanor count of violating of the Clean Water Act, 33 U.S.C. §§1321(b)(3), 1319(c)(1)(A);

one misdemeanor count of violating the Migratory Bird Treaty Act, 15 U.S.C. §§ 703, 707(a) and

one felony count of Obstruction of Congress, 18 U.S.C. § 1505.    *United States v. BP Exploration*

*and Production, Inc.,* Crim.  No.  12-292, Doc.  25.

On **November 15, 2012**, BP entered into a guilty plea to the entire Bill of Information and

agreed a Factual Basis in which it admitted that it had obstructed Congress in its inquiry and

investigation through the Subcommittee on Energy and Environment of the Committee on Energy

and Commerce as to the flow rate of the Macondo well through omissions and false and

misleading statements made to Congress on **May 24, 2010** by withholding information that

showed flow rates far higher than 5000 BOPD, including, rates as high as 96,000 BOPD.  BP

admitted that the dissemination of this fraudulent  information and misdeeds was committed by

BP's former vice president, and his knowledge and actions were held attributable to BP itself.

*See United States v. BP Exploration and Production, Inc.,* Crim.  No.  12-292, Doc.  2-1, Factual

Basis, at pp.  16-18 of 56.

Nonetheless, the Department of Justice chose to pursue the claim against Mr. Mix

personally,  not as a surrogate for BP, but as an individual.  Six months after BP's guilty plea to

the manslaughter of 11 men and obstruction of Congress, a Superseding Indictment was filed on **May 20, 2013** with the instant Second Superseding Indictment being filed on **March 20, 2013.** Thus, it was clear from at least **November of 2012** that at a minimum,  Mr. Mix's employer had admitted that it had disseminated fraudulent flow rate information  to decision makers concerning the probability of success of Top Kill.

It was not until April 19, 2013, that counsel for the Undersigned filed on behalf of him and his spouse, two forms entitled "Direct Filing Short Form: Claim in Limitation–Joinder n Master Answer–Intervention and Joinder in Master Complaints–Plaintiff/Clamant Profile Form."[7] Thus, at the time these claims were filed, **BP had already pleaded guilty to manipulating information concerning flow rates.**

### C.   Phase Two of MDL-2179 Commenced and Ended Before Mr. Mix Was Tried and Had No Effect on the Trial of Mr. Mix

Counsel for Mr. Mix identified to the Court (not in its pleadings but attached to the triggering letter that resulted in this motion) five specific pleadings that can be found in the docket of MDL-2179 (retrieved in CM/ECF as 10-md-2179) that Mr. Mix  would offer to support his contentions.  They are as follows:

1)      Master Answer/ Complaint (Doc.  879) filed 12/15/10;

2)      Aligned Parties' Phase Two Pre-Trial Brief (Doc.  11411) filed 9/18/13;

---

[7]As demonstrated by this Court's opinion, counsel for Mr. Mix's arguments are completely devoid of merit.  Obviously, the undersigned notes that he relied on counsel to pursue his claims against BP as he had no understanding or knowledge concerning the factual and legal basis for the claims for punitive damage claims in MDL-2179.  After investigating the factual and legal bases relative to these claims with respect to the Undersigned's property, the Undersigned has now directed counsel to waive all punitive damage claims filed.

3)      Plaintiffs'/Claimants' Phase Two Post-Trial Brief (Doc.  12038) filed 12/20/13;

4)      Plaintiff's/Claimants' Proposed Findings and Conclusions Limitation and Liability
Trial    (Doc.  12039) filed 12/20/13; and

5)      Aligned Parties' Proposed Phase Two Findings of Fact (Doc.  12043) filed
12/20/13.

Counsel for Mr. Mix has in hyperbolic rhetoric decried this Court's "impartiality" as being
so evident (in spite of the afore-mentioned waiver) by pointing to certain  "triggering allegations"
concerning the activities of which Mr. Mix is alleged to have been involved  with in reference to
the KWOP meeting (which was the primary focus at trial as to motive/state of mind of Mr. Mix)
and the effect of those specific allegations of manipulation of numbers in reports to Government
officials thus implicating specific activities in which Mr. Mix played a part, and thus allegedly
have an effect on a §455 inquiry in **this** litigation.  It appears to the Court that those specific
allegations  were not raised by the MDL Bundle B1 plaintiffs until the filing of the "Aligned
Parties' Pre-Trial Statement" (MDL-2179, Doc.  11411) which was filed on September 18, 2013,
nearly a year after BP had pleaded guilty to manipulating the flow rate calculations.

However, the Court marvels at counsel's outrage and surprise at these allegations
considering the Factual Basis to which BP pleaded guilty on November 15, 2012 (nearly a year
before) in which BP admits omissions and false and misleading statement's in its May 24, 2010
response ("Markey Response") to the Committee on Energy and Commerce.  (See *United States
v.  BP Exploration & Production, Inc.*, Cr.  No.  12-292, Doc.  2-1 at pp.16-18 of 56).  In that
admission, six separate falsehoods, omissions and misrepresentations are delineated. Mr. Mix

was employed by BP; however, as will be discussed in more detail, *infra,* this Court prevented any taint of BP's conviction from being brought to the jury's attention.

The Phase II trial commenced on September 30, 2013 and ended on October 18, 2013, and as such, it is not surprising that the Aligned Plaintiffs included facts and allegations to demonstrate that BP was manufacturing flow rates not just to Congress (to which it had already specifically plead guilty) but to those governmental entities and persons responsible for a determination as to whether Top Kill would be tried.  Specifics of the actions which were presented in this criminal trial indeed are set out in 3 of 5 of pleadings filed (all of which were filed **after this trial ended**).

In reality, the issue in the MDL Phase Two trial centered on whether that faulty information actually had an effect on the Government's decision to try Top Kill.  In contrast, the key issue presented in this criminal matter was **Mr. Mix's** state of mind (not that of BP's who had already pleaded guilty) when he deleted text messages.  Stated differently, the question presented to the jury (not the Undersigned) was whether Mr. Mix subjectively believed at the time of the deletions that his destruction of the texts would impede a grand jury's inquiry.

### D.   The "New" Evidence Does Not Create A Disqualifying Circumstance Under Either § 455(a) or (b)

#### 1.   As to the Undersigned

Counsel for Mr. Mix learned of the Undersigned's having joined in MDL-2179 on Friday 17, 2014.  Based on this new knowledge and having found and reviewed the above-noted pleadings in the MDL-2179 in four days, she now contends that because there are identical allegations concerning "fraudulent flow rate" information having been disseminated by BP in

both the civil and criminal suit, "the outcome of Mr. Mix's trial *could* substantially affect the success of the PSC'S/PLC's fraud allegations and, by extension, the Court's and Law Clerk's punitive damages claims against BP." (Doc. 720 at 15 of 24). As proof of this contention, counsel contends that because:

(1)   the indictment of Mr. Mix essentially rendered him unavailable as an exculpatory defense witness to BP in MDL 2179; and

(2)   this "assisted" the PSC/PLC in its attempt to (a) to characterize Mr. Mix's text message as a smoking gun evidence of BP's fraud and (b) to claim that flow rate information was withheld and not shared with government officials and scientists during the response effort.

Then counsel opines:

> Had Mr. Mix been available to testify, he could have explained that the message to Mr. Sprague was no smoking gun, but rather a logical and obvious observation; he also could have explained that he personally, together with others at BP, had repeatedly shared flow rate modeling information with the United States government officials and scientists during the response effort. If Mr. Mix were to be convicted, it would substantially damage his ability to serve as a credible BP defense witness in the future (for example, if Judge Barbier allowed the Phase Two evidence to be re-opened on BP's motion) because his conviction would be grounds for impeachment under Federal Rule of Evidence 609. All of this benefits the PSC's/PLC's efforts to obtain punitive damages for the plaintiffs and claimants in MDL 2179.

Doc. 720 at 15-16 of 24.

### a.      Grounds for Recusal Under § 455(b)(4)

Clearly,  this string of "ifs'" and "coulds" does not constitute and cannot trigger a § 455(b)(4) conflict.  Specifically, that statute is triggered  if a judge  has "a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding.  This basis cannot be waived by any party."  28 U.S.C. § 455(b).  The subject matter in this criminal trial is Mr. Mix's state of mind, nothing more, nothing less; thus as was agreed to at the time of the initial disclosure, this provision as to having a "financial interest in the subject matter or a party in the proceeding" by the statute's  very terms is not applicable here.  Moreover, as has been demonstrated throughout this opinion, it is highly unlikely if not impossible that a verdict concerning Mr. Mix's state of mind and/or his unavailability to testify in a civil trial could affect a monetary award in a civil trial of BP.  This argument is particularly nonsensical.

Frankly, if Mr. Mix's counsel's logic where to be played out to the full, in reality, it is Mr. Mix's **indictment**, not this trial that prevented his testifying.  Thus, the true culprit is the United States and thus the sole possible reason it pursued Mr. Mix, particularly in light of the BP guilty plea, is only to prevent him from testifying at the civil trial where the United States stands to win substantially more in fines if it proves that 87 more days of oil flowed in the neighborhood of 80,000 to 1000,000 BOPD.  The court does not espouse such a theory but uses it only to demonstrate the absurdity of Mr. Mix's counsel's argument.  This scenario is described solely to demonstrate how simple it is to draw inferences and using *ipse dixit* logic to impugn the integrity of an individual, a corporation, or the Government.   Obviously, it is not this Court that brought the indictment and it has entered a number of orders based on the law and the facts as to why it could not dismiss this indictment.  In addition, this Court has noted on the record many times its

25

concern that perhaps individuals far more culpable in the "fraudulent flow rate" scheme have not been brought to justice.  This is not the domain of the Court and cannot drive its decisions.

### b.  Grounds for Recusal under §455(a)

Moreover, it is impossible that a **reasonable person** **knowing all of the facts** of **this case** could possibly conceive that Mr. Mix's ability to "exculpate" BP would result in a greater punitive award, particularly in light of BP's guilty plea.   Moreover § 455(a) "appearance of impartiality" is not implicated because these assertions are so "remote, contingent, or speculative"  they cannot possibly "reasonably bring into question the Undersigned's partiality." *United States v. Henry*, 2008 WL 5146615, *2 (E.D.La. Dec.  5, 2008).  Again, the overwhelming testimony at the MDL trial would not have been countervailed  by Mr. Mix.  In reality, Mr. Mix is mentioned in the context of being one of the only actors to have explained that Top Kill was failing because there was flow rate over 15,000 BOPD.  (Doc. 11411, at 18 of 41, MDL-2179, 10-MD-2179). Moreover, there was testimony presented by BP to demonstrate that MMS and Secretary Chew did not rely on BP's estimates, that the Government had its own calculations and they knew it could have been more than what BP was indicating.  Finally, it is highly unlikely that any judge would re-open a case such as Phase Two of MDL-2179 in order to obtain Mr. Mix's testimony. Simply put, "exculpatory" testimony concerning deleted text messages between Mr. Mix and Mr. Sprague as to BP's flow rate fraud of the Phase II trial which is completed and under submission could not conceivably change the outcome of that civil trial.

To summarize, simply because some of the same facts are adduced at two trials does not make the outcome in one trial affect the other.  This statement is supported by the fact that in this

instance, (1) each trial was presided over by two different judges, (2) the *Mix* trial was decided by a jury,  and (3)  the issues were dramatically different.  One is a civil matter, the other a criminal one.  The judge-tried  MDL-2179 civil case concerned the allocation of fault and award of damages arising out of the **consequences of the oil spill** from the Macondo well.  The criminal trial of Kurt Mix focused on **his state of mind** at the time he allegedly deleted a string of texts and whether he would be impeding the deliberations of a Grand Jury.  It is irrelevant for the purposes of Mr. Mix's trial whether BP acted fraudulently or not.  It was solely for a jury to decide based on the evidence that was adduced at trial whether **Mr. Mix** thought that BP had something to hide and that this motivated him to delete the text messages between him and his supervisor.  A guilty verdict in the Mix trial means nothing in the *Deepwater Horizon* matter. His actions are removed in time from the issues in the civil trial.  The actions concerning fraudulent flow rate occurred from April through August  of 2010.  Mr. Mix's deletions occurred in October of 2010, after the flow had ended.

Finally, and most importantly, this Court consistently and repeatedly refused the introduction into evidence or argument concerning any misconduct by BP.  As noted by the Government in its Reply, in ruling on Mr. Mix's "Motion in Limine to Preclude the Government From Referring to the 11 Deaths That Resulted From the *Deepwater Horizon*'s Explosion, any Pre-Spill Misconduct on the Part of BP, the Size of the Oil Spill or BP's Guilty Pleas as to Kurt Mix," (Doc.  251) this Court held:

> Evidence of misconduct by BP prior to the spill and evidence BP pleaded guilty to criminal charges is not relevant evidence in this case.  any misconduct by BP prior to the spill has no relevance to the acts of Kurt Mix which occurred entirely after the explosion about the *Deepwater Horizon*.  Nor is BP's guilty plea relevant to this case.  That guilty plea occurred long after the deletions which serve as the foundation for the criminal charges against Mr. Mix, and is of no

consequence in determining the criminal charges pending against Mr. Mix. Therefore the Court grands defendant's motion to the extent that it seeks an order precluding any reference to misconduct by BP prior to the spill or to the fact that BP pleaded guilty to criminal charges.  (Doc.  362 at 2).

Similarly, in granting the defendant's motion *in limine* to preclude the Government from offering evidence of misstatements of other BP employees, the Court stated:

> There is an exception when the individuals involved are part of a conspiracy; however, here no conspiracy has been charged.  With respect to public statements by others at BP, the Court finds no reason to deviate from the general rule that the act of another cannot be used to establish the intent of the defendant.  Therefore, public statements made by other BP personnel cannot be admitted into evidence to show the intent of Mr. Mix.

(Doc.  444 at 4).  This Court did not allow evidence of BP's misconduct to be presented at trial.

Moreover, the Court excluded evidence over the Government's adamant objection concerning notebooks which were a very important part as to proof with respect to Count 2.   The Government's theory was that Mr.  Arabia and Mr. Mix had conspired to remove allegedly incriminating material that was contained in those books so that copies that were to be provided to the vendor would not contain same.  The Court instructed the jury as follows in that regard:

> You heard testimony from Mr.  Arabia which in part concerned Mr. Mix's taking notes and writing in the margins of certain documents.  You also heard testimony concerning the Project Book (Exhibit 51A) and the "Big Book" (Exhibit 57) and the copying of one or both in whole or in part at Kink's by Mr.  Arabia.
>
> I ruled that this evidence as to the taking of notes or writing in the margins of unspecified documents by Mr. Mix or the copying of the "Project Book" and/or the "Big Book" at Kinko's is not relevant to the issues to be decided by you in this case.  Therefore you have been instructed to absolutely disregard such evidence and any inference made by the Government of wrong-doing as between Mr. Arabia and Mr. Mix with respect to these books in your deliberations.  You may, however, consider the transcript and recording of the voicemail left by Mr.  Arabia on Mr. Mix's phone in relation to the charges contained in Count II of the Indictment.

(Final Jury Charge at 11).  Mr. Mix was acquitted on that count.

28

In addition, as to the evidence which the court allowed of misstatements by BP at the KWOP meeting, the Court did allow such testimony but only in light of Mr. Mix's possibly adopting same because they were made in the presence of him and he was silent.  That silence was not used to demonstrate that Mr. Mix had done something illegal because he had been silent at the KWOP meeting where it was suggested that BP had consistently argued flow at 5000 BOPD.  Rather that evidence was admitted as evidence of Mr. Mix's motive for the deletion. Finally, the trial record is devoid of any instances where BP's misconduct was raised or presented by the Government.  Thus, this argument particularly in the context of a completed trial is meritless.

Clearly the foregoing facts do not present an instance where a reasonable person, knowing all of the facts, would harbor doubts concerning the judge's impartiality as is required under § 455(a).

### 2.     As to Family and Friends

Mr. Mix's counsel opines that for the same factual reasons outlined in detail above, §§ 455(a) and (b)(4) are implicated with respect to certain friends and family and the Court should now be disqualified on that basis.  In particular, counsel cites to two of the family members (in their role as attorneys for numerous plaintiffs joined in the civil MDL), and two of the Court's personal friends (one of whom owns and/or controls numerous corporate entities seeking punitive damages against BP) and the other of whom is a member of the PCS itself and thus will collect a substantial share of whatever punitive damageS are imposed on BP.  Counsel for Mr. Mix continues that as such they are (1) personally aligned with and invested in the disputed "flow rate

fraud" allegations that the prosecution used to secure a conviction of Mr. Mix and (2) are now using Mr. Mix's still-unsettled conviction and testimony elicited over defense objection in Mr. Mix's criminal case to buttress their punitive damages claims against BP.

For all of the same legal arguments stated in subsection (1) of this section, these allegations are devoid of merit.  The effect of the prosecution of Mr. Mix  and guilty verdict rendered by a jury in the *Mix* trial can in no way affect the monetary award in the MDL-2179 proceeding.  Moreover, the idea that by the filing of a claim in the MDL-2179  would trigger a separate independent basis for disqualification as to disclosure of friends' claims is ludicrous at best.

Counsel for Mr. Mix contends that this Court has a financial interest in this litigation because two specific friends are involved with the BP civil suit, one as a member of the PSC and one as a claimant.  Counsel for Mr. Mix contends that this was a revelation that occurred after the trial.  The fact that the Undersigned has many friends, former clients, acquaintances, neighbors, etc.  all of whom may have a claim against BP was patently obvious from the time this matter was assigned to the Undersigned as would be the case with any judge in this district considering the scope of the BP spill and litigation.  It is utterly ludicrous to contend that the Undersigned was under any duty to determine which friends, acquaintances, and former clients had a potential claim in the civil litigation and disclose same at any time during these proceedings.

The Undersigned notes that as a 72 year old individual who practiced law in Houma, Louisiana for 28 years, has sat as a judge for nearly another twenty, and has interacted with the Louisiana Bar throughout that time serving on various committees and other civic endeavors, the number of "friends" that could "profit" from the proceedings are innumerable.  For illustrative

purposes only, the Court notes that Stacy Bruton, who performed most of the clerking duties on this case up until the actual trial, was a schoolmate of Walter Becker, local counsel for Mr. Mix. Janet Daley has been a friend of Mr. Becker's since 1976.  Moreover, the Undersigned has been a long-standing friend of the father of Charles D.  Marshall, III  and for a time played bridge regularly with his grandfather.

The Court's relationships with relatives of the mentioned attorneys in this case are arguably more relevant than any disclosure of the Court's having friends who may or may not have claims or potential claim in the civil litigation.  It was not required under the relevant statutes at any time during these proceedings to disclose any of the types of personal relationships with the aforementioned attorneys practicing before me in this criminal trial.  To have done so would have been as patently ludicrous as Mr.  Mix's counsel's proposed non-existent standard which would allegedly  mandate the Court to disclose to the litigants any friend that may have a claim regardless of whether the Court knows or doesn't know whether that friend is pursuing that claim–which knowledge is clearly not within the purview of the Court.  Put another way, there is clearly a more direct link of possible bias connected to personal relationships with trial counsel involved in this criminal proceeding before the Undersigned than there is to the grossly attenuated links of friends with possible claims in a civil matter before another judge.

What the Court finds most concerning, however, about the particular persons counsel for Mr. Mix chose to target is that they are the ones mentioned IN the aforementioned "unsolicited e-mail"of a discontented former employee of one of the members of the PCS.  A simple Westlaw search or Goggle search would have revealed that the trustworthiness of these allegations is beneath the level of dubious.  Indeed, when these materials were transmitted to the Court, BP's

31

attorneys apologized for having to relay them, noting the spurious nature of them.  That officers

of the Court would make these allegations which are so ephemeral– frankly

phantasmagorical–based on rank conjecture is lamentable.


### III.    This Motion Was Filed Untimely

Clearly, considering all of the circumstances discussed above, the fully-informed waiver

in May of 2012, the clearly un-biased trial of Mr. Mix, the pending motions for acquittal which

are best reviewed by the judge who actually presided over the trial, this motion is untimely and its

filing brings to mind the idea that bears repeating here:

> "The public is not likely to be convinced that a judge is any less biased merely
> because the facts that cast doubt upon his impartiality were not complained about
> until well into the proceeding.   On the other hand, it might legitimately be asked
> whether the spectacle of an attorney dragging his opponent through a long and
> costly proceeding, only to conclude by moving for disqualification of the judge, is
> not equally detrimental to public impressions of the judicial system.

 Note, Disqualification of Federal Judges for Bias or Prejudice, 46 U.Chi.Rev. 236,  263-64 n.

155.


### Conclusion

Mr. Mix's counsel's contentions and characterization of the Court's actions and their

consequences are naive at best and disingenuous at its worst.  This motion (1) mis-characterizes

the nature of the Court's full disclosure of its valid claim **against BP,** (2) mis-characterizes the

resulting implications of the filing of the Undersigned's property claim in the In re :Oil Spill Deep

Water Horizon , MDL-2179, and (3) alleges an elaborate scenario (based on the wholesale

adoption of  allegations contained in an unsolicited e-mail written by a party who has no

connection to or first-hand knowledge of the Undersigned or his family) which culminates in calumnious accusations and suggestions of absurd consequences.  Moreover, it was filed:

(a) **after** this Court's immediate full disclosure in May of 2012 concerning the Undersigned's valid and active claim for damages arising out of his ownership of property impacted by the oil spill in the separate and totally unrelated **(i) civil proceeding (ii) before a different judge (iii) against BP;** (b) **after** a two and half week trial and  rulings on innumerable pre-trial motions, motions in limine, motions to quash, evidentiary motions on exhibits and testimony, as well as a constant barrage of motions filed by Mr. Mix's counsel during trial[8]**;** and (c) **despite** Mr. Mix's counsel's (I) oral waiver in a May 31, 2012 status conference and (ii) a "blind recusal" response filed on June 5, 2012, attesting to an  unqualified waiver of **any potential conflict based on the Court's disclosures**.

Finally, his counsel's baroque allegations  that proceedings in this criminal matter concerning a single individual's wrongdoing could be manipulated so as to result in family members and friends reaping monetary benefits in a civil suit for damages against BP so as to trigger mandatory disqualification of the Undersigned is beyond the pale.  There is no basis in law or fact wherein **Mr. Mix's** conviction in a **criminal matter** that is solely about Mr. Mix's state of mind when he deleted a string of e-mails would result in a monetary benefit to all of claimants in the MDL case against BP.  It is blatantly impossible and incredibly illogical.  The allegations

---

[8]At the time the verdict was rendered, in this single defendant, two count indictment, there were 701 docket entries in this matter.  The hours this Court spent in adjudicating these pre-trial and trial disputes cannot be counted.  Indeed, during trial, practically every evening after trial, one or multiple new motions were filed by the defendant.

contained in this motion read more like an Oliver Stone movie script than any legal document this Court has encountered in its nearly 20 years on the bench.

Moreover, the adjudication of those facts concerning fraudulent flow rate in one suit has no bearing on the adjudication of those facts in the other.  Mr. Mix was not on trial for falsifying flow rate information; he was on trial for deleting text messages because they might be incriminating in the eyes of  a grand jury investigating wrong doing.  The jury in this criminal trial made no finding that implicates BP.  Mr. Mix's deletions are irrelevant as to the issues in MDL-2179 as those actions were taken long after the flow of oil ended.  Accordingly,

**IT IS ORDERED** that  Defendant's Motion for Recusal (Doc.  720) is **DENIED.**

New Orleans, Louisiana, this 13th day of January, 2014.

_____
**STANWOOD R.  DUVAL, JR.**
**UNITED STATES DISTRICT COURT JUDGE**

34