## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA                              CRIMINAL ACTION

VERSUS                                                              NO. 12-171

KURT E. MIX                                                SECTION "K"(1)

## ORDER AND REASONS

Before the Court is Defendant's Rule 29 Motion for a Judgment of Acquittal (Doc. 710).[1]
Kurt Mix ("Mix") maintains that based on (1) the overwhelming lack of evidence on every
element of  18 U.S.C. § 1512, the obstruction of justice statute underlying Count One, and (2)
the Government's failure to establish proper venue, he is entitled to a judgment of acquittal.  Mix
was involved in estimating the flow rate of oil and the attempts to stop that flow in the aftermath
of the *Deepwater Horizon* catastrophe. Mix stands convicted of having obstructed justice by
virtue of the deletion of a string of text messages between his BP supervisor and himself which
the Government maintained was done to impede a foreseen grand jury inquiry into possible
wrongdoing concerning the reporting of those flow rates and the feasibility of certain actions
taken to stem the flow of oil.   For the reasons that follow, the Court finds that Mix's motion is
without merit.

---

[1]Defendant's Motion for a Judgment of Acquital (sic) (Doc. 679) was filed immediately after the close of
the Government's case-in-chief, and the instant motion (Doc. 710) was filed after the close of all of the evidence.  As
to the first filed motion, the Court reserved its decision thereon pursuant to Fed. R. Crim. P. 29(b) which requires the
Court to decide that motion based only on the evidence adduced during the government's case-in-chief.  As noted in
footnote 6 to Defendant's Rule 29 Motion for a Judgment of Acquittal (Doc. 710), no incriminating evidence was
adduced during the defense's case-in-chief and  the Government did not put on a rebuttal case, making this
distinction one without a difference.  Thus, in an e-mail to the Court, the defense agreed to the Court treating the
first-filed motion as being superseded by the second which is how the Court will proceed.

## I.  BACKGROUND–TESTIMONY AND EVIDENCE ADDUCED AT TRIAL

### A.        Macondo Blow-Out and BP Response

On April 20, 2010, the blowout of the Macondo well occurred in the Gulf of Mexico resulting in eleven deaths and the largest offshore oil spill in the history of the United States. Initially, BP reported the flow of oil into the Gulf of Mexico caused by the explosion to be 1,000 barrels of oil per day ("BOPD"), but in reality, it proved to be exponentially larger.  As a result, flow rate became a seminal issue for BP which still faces potentially the largest civil fines ever assessed under the laws of the United States as a result of the oil spill; that fine will be a function of the actual amount of oil found to have been dispersed into the Gulf of Mexico.

Mix, a BP drilling engineer, worked on the response to the Macondo blowout by working on flow rate models and developing flow rate calculations estimating the amount of oil flow coming from the Macondo well.  (Transcript at 949-50).  Bill Burch, a consultant with Wild Well Control,  worked with Mix on modeling the amount of oil flowing from the Macondo well or the "blowout rate" from April 21st.  (Transcript at 951-53).  Mr. Burch testified at trial that:

(1)        Initial models supported flow rate estimates of between approximately 64,000 and 1110,000 BOPD.   These calculations were obtained on April 22, 2010. (Transcript at 954).

(2)        After the *Deep Water Horizon,* the drilling rig at the Macondo well site, sank on April 23, 2010, Burch and Mix changed their flow rate models to account for the fact that the "riser pipe" had fallen to the sea floor which resulted in more pressure on the exit area from well. In other words, as a result of the collapse, the flow of oil slowed.  (Transcript at 954-57).

(3)     The flow rates were then modulated to the range of high-50,000 to low-70,000 BOPD.  (Transcript at 955).

(3)     Nonetheless, BP continued to maintain publically that the flow rate was 1,000 BOPD.  (Transcript at 961).

(4)     Burch discussed with the defendant several times that their own flow rate calculations supported flow rate estimates that were much higher than 1,000 BOPD, but  Mix said that they "were not to push back to BP about those numbers"  and that the "official company motto is 1000 BOPD" (Transcript 962-66).

(5)     Sometime during the week of th 26th of April, Mix was asked to attempt to build a case where the flow model could match 1,000 BOPD.  (Transcript at 967).  In order to reach this flow rate, the hole from which the oil flowed would have had to be 3/4 of an inch.  (Transcript at 970 and 979-80).

After April 29, 2010, the Government[2] increased its public flow rate estimate to 5,000 BOPD (Transcript at 981-82) with which estimate Mr. Burch also disagreed.  In response, Mix stated, "Those are the numbers being reported and it's not our job to take that mission on." (Transcript at 982).  After May 9, 2010, actual sub-sea pressure and temperature data became available, and another expert, Dr. Ole Rygg, began to work with Mix incorporating this new data which work rendered a flow rate of between 37,000 to 74,000 BOPD.  (Transcript at 994).

Around May 12, 2010, Mr. Burch began discussions with Mix and others at BP about the "Top Kill" procedure.  (Transcript at 1000).   Top Kill was the name assigned to a well control

---

[2]There was testimony that the increased estimate was disseminated  by the United States Coast Guard (Transcript at 981) and by the National Oceanographic and Atmospheric Administration ("NOAA").

technique contemplated by BP whereby heavy, viscous mud would be pumped into the aperture from which the oil flowed.  The aim was to inject into the well sufficient mud faster than the oil would flow through the same exit, resulting in "killing" the flow of oil from the aperture. (Transcript 994-1000).  Jonathon Sprague, who was Mix's supervisor and close personal friend, was included in these discussions.  During the meeting, BP representatives relied upon the public flow rate estimate of 5,000 BOPD in assessing whether Top Kill would work.  (Transcript 1002). Eventually, Mix and Mr. Sprague proposed that they ask Dr. Rygg to see if Dr. Rygg could develop a model that would result in a flow rate of 5,000 BOPD.  (Transcript at 1002-03).

Ultimately, Dr. Rygg was able to design a model supporting a 5,000 BOPD flow rate; however, that result depended on assuming that there was an obstruction or choke deep inside the well.  (Transcript at 1004-05). Without the choke, Dr. Rygg and Mix's flow rate models supported flow rates much higher than 15,000 BOPD, that is from 40,000 to 70,000 BOPD. (Transcript at 1006).

On May 17, 2010, a meeting referred to as the "Kill the Well On Paper" or "KWOP" meeting was held with the government scientists and engineers from  the National Laboratories (the "National Labs") to assist with and evaluate the Top Kill exercise.  (Transcript at 1118-19). "The purpose of the meeting was to go over the planned procedure for doing the Top Kill so that the Secretar[y] of Energy and the Secretary of Interior and the representative from the U.S. Geological Survey and the people who worked with them would know what to expect.  So that if they felt the job wasn't going right, they would understand that and would agree with BP or direct BP to stop the job."  (Transcript at 1123).  Moreover, the meeting was an effort to correct

any perceived flaw in the procedure that might make it unsuccessful or to abort the effort should it be "so bad" that it should not be tried.  (Transcript at 1123.)

Mix and Dr. Rygg were in attendance and presented flow rate information.   While there was testimony from Dr. Rygg that there may have been slides presented at the KWOP meeting that indicated that the flow exceeded 15,000 BOPD,[3] the Government offered evidence of alleged discrepancies in his testimony from previous testimony given by him to the FBI and in a civil deposition.  (Transcript at 2476-80.)  In addition, Dr. Curtt Ammerman[4] of Los Alamos Laboratory and Dr. James Redmond of Sandia National Laboratory could not recall anyone from BP discussing flow rates higher than 5,000 BOPD, and both stated that they would have remembered such a discussion had it occurred because they were focused on the importance of flow rates.  (Transcript at 1310, 1312-13, 1418-20).  In addition Dr. Kate Baker[5], a former BP engineer with 35 years of experience and another participant in the KWOP meeting, took self-described "meticulous notes" as they were to be circulated to people who were not able to attend the meeting.  (Transcript at 1124.)  Government Exhibit 17 is the transcription of those notes that she sent that evening after the meeting to the other participants to be certain that she had faithfully recorded the important things.  (Transcript at 1216).

---

[3]See Testimony of Ole Rygg, Transcript at 2337-2476.

[4]Dr Ammerman prepared a summary of what happened at the KWOP meeting and used that material to refresh his recollection.  (Transcript 1412-13 and Govt. Exh. 19B).  In his testimony, he stated unequivocally that it was made clear that in the event the flow were to exceed 15,000BOPD that Top Kill would not be successful. (Transcript at 1418.)

[5]Dr. Baker was employed by Swift Technical Services at the time of the KWOP meeting and was paid on an hourly basis for her work on the Macondo blowout.  She worked as liaison for BP with the people from the National Labs.  (Transcript 1116-18).

5

Government Exhibit 18 was presented at trial which was Kurt Mix's response to her initial e-mail.  Mix noted that it was an "excellent summary" and only added 5 words to the memo at the end of the second paragraph of the Hydraulic Kill Section which referenced the vent line discussion, which words were "or subsea vent line option." (Transcript at 1129).  None of her notes or Mix's addition mentioned any flow rate higher than 15,000 being discussed at the meeting.   In addition, Dr. Rygg was also given the opportunity to add to Dr. Baker's notes, but made no changes to indicate that there had been any discussion concerning flow rates being higher than 5000 BOPD in this KWOP meeting.  (Transcript at 2468).  Moreover,  Dr. Baker testified that had there been any discussion of a flow rate of that magnitude, any such discussion would have been included in her notes. (Transcript at 1136-37).

Specifically, the following testimony was elicited from Dr. Baker:

A.      We asked in the meeting at the end of the presentation–and I don't know who asked, if it was myself or if it was Kurt or somebody else in the room–does anybody have any reason why we should not proceed with this?

Q.      And what happened?

A.      There was silence.  And it wasn't just, okay, no reason, we'll go right on.  There was actually a pause to give people time to reflect.  And what I took away from that was that though nobody knew what the rate was or where the chokes were in the well, nobody had enough confidence that the rate was higher than what we could kill to say, we shouldn't try this, we shouldn't put men and material at risk, because there's enormous risk with that operation.  I mean, one of those pumps could blow up or something like that, and you could kill some people out there.
        So you don't want to do this unless you really think there's a chance that it's going to work–a decent chance that it's going to work.

(Transcript at1136-37).

As a result of these discussions, ultimately, the National Labs provided a recommendation to Secretary of Energy Steven Chu that Top Kill should proceed. (Transcript at 1421). BP attempted the procedure between May 26-28, 2010. The action was unsuccessful. The well was not successfully plugged until late summer of 2010.

### B.      United States Criminal Investigation

In April, 2010, after the blow-out, the Federal Bureau of Investigation ("FBI") opened a preliminary criminal investigation in the Eastern District of Louisiana which was the appropriate location in light of the situs of the Macondo well–that being off of the coast of Louisiana. Then, on June 1, 2010, the Attorney General of the United States announced that the Department of Justice had opened a full criminal investigation into the BP oil spill (Transcript at 555). Shortly thereafter, the FBI converted its investigation into a "full" criminal investigation, which gave the FBI the full set of its investigative powers.

As Special Agent Kelly Bryson of the FBI testified, the FBI's criminal investigation focused on the events leading up to the spill (pre-spill) and  BP's actions following the spill (post-spill). The full investigation was carried out by numerous agencies, including the Department of the Interior, the Environmental Protection Agency, Securities and Exchange Commission, the United States Coast Guard, Louisiana Fish and Wildlife, and U.S. Wildlife and Fisheries, and included both pre-spill and post-spill matters. (Transcript at 539, 553-555, 647).

A main focus of the government investigation with respect to "post-spill" matters was on the amount of oil flowing from the Macondo well into the Gulf–the flow rate. (Transcript 556-57). Agent Bryson testified that "the important part of the post-spill, in real simple terms, was

7

what was known publically and what was known privately." (Transcript at 557). This task included looking into documents and people who had information concerning the flow rate specifically. As previously noted, the criminal nature of this investigation was announced publically by Attorney General Holder on **June 1, 2010.** Specifically, the FBI was investigating whether "BP and engineers or people were calculating numbers much higher so that Top Kill didn't make sense to actually work or, in fact, the numbers were just way higher than what would work." (Transcript at 559, 619, 667). In other word, the focus of the investigation was whether there was any discrepancy between what BP was stating publically about the flow rate and what BP may have known privately about flow rate in light of the response of BP.

A Grand Jury was impaneled in December of 2010 in the Eastern District of Louisiana. Because Kurt Mix was involved in the calculations of flow rate, he came to the attention of the FBI. (Transcript 562-63). Initially, he was not a target of the investigation, rather he was considered as a witness to help in the investigation of whether there were discrepancies between the public estimates and the BP private estimates of flow rate.[6]

---

[6]Six months after Mr. Mix was initially indicted, on **November 11, 2012,** a fourteen count Bill of Information was handed down in the Eastern District of Louisiana against BP. See *United States v. BP Exploration and Production, Inc.,* Crim., No. 12-292, Doc. 1. The Bill of Information included eleven felony counts of seaman's manslaughter under 18 U.S.C. § 1115; one misdemeanor count of violating of the Clean Water Act, 33 U.S.C. §§1321(b)(3), 1319(c)(1)(A); one misdemeanor count of violating the Migratory Bird Treaty Act, 15 U.S.C. §§ 703, 707(a) and one felony count of Obstruction of Congress, 18 U.S.C. § 1505. *United States v. BP Exploration and Production, Inc.,* Crim. No. 12-292, Doc. 25.

On **November 15, 2012**, BP entered into a guilty plea to the entire Bill of Information and agreed to a Factual Basis in which it **admitted that it had obstructed Congress in its inquiry and investigation through the Subcommittee on Energy and Environment of the Committee on Energy and Commerce as to the flow rate of the Macondo well through omissions and false and misleading statements made to Congress on May 24, 2010 by withholding information that showed flow rates far higher than 5000 BOPD, including, rates as high as 96,000 BOPD. BP admitted that the dissemination of this fraudulent information and misdeeds was committed by BP's former vice president, and his knowledge and actions were held attributable to BP itself**. *See United States v. BP Exploration and Production, Inc.,* Crim. No. 12-292, Doc. 2-1, Factual Basis, at pp. 16-18 of 56.

**None of this information was imparted to the jury, and the jury was unaware of these facts to insure no unfair prejudice as to Mix.**

### C.      Legal Hold Orders–A Foreseen Grand Jury

As early as April 22, 2010, BP began to issue Legal Hold Orders–Preservation Notices ("LHOs").  The first one, the receipt of which Mix acknowledged on April 29, 2010 (GX 8), stated: "Applicable law requires that all BP employees help BP comply with its duty to preserve all information potentially relevant to this incident, . . . ." GX 8A. In a section styled "Documents and Information Covered,"  it stated, "Paper documents, electronically stored information and physical objects that must be saved include any information that is recorded in any fashion."  *Id.* The description continued that as to physical material, tangible items or things that may be stored in any medium, device or location, the hold order applies to Blackberrys, PDAs and cellphones and any electronic storage medium.  *Id.*  Another unacknowledged hold was sent on April 29, 2010.  On May 3, 2010 another identical  one was sent and receipt by Mix acknowledged on May 9, 2010.

On May 4, 2010, a Legal Hold Order Reminder was sent and it specifically stated in bolded print, **"This email is being sent as a reminder that your obligation under the Legal Hold Order to preserve documents and information includes, but is not limited to an obligation to preserve <u>text messages</u>, <u>Instant Messages</u> and <u>voicemail messages</u>.**  GX 8E.

Two more LHOs which were sent on May 25, 2010, (GX 8F) and July 2, 2010 (GX 8G) were acknowledged received by Mix.  These LHOs specifically delineated that the specific electronically stored subject matter that was covered by this legal hold notification included in relevant part:

---

- Any damages that may have resulted from the April 20, 2010 incident and subsequent hydrocarbon discharges, including any damages to natural resources, wildlife, property or commercial interests, or any personal injuries;

- BP's compliance with the Outer Continental Shelf Lands Act, Oil Pollution Act and the Clean Water Act and any associated rules, order or regulations, in connection with Mississippi Canyon Block 252 and/or the *Deepwater Horizon.*

(GX 8F).

Finally on **July 28, 2010,** an LHO which noted in red lettering that it was an updated notice, contained in the description of the specific subject matter covered by the notice the following statement:

Applicable law requires that all BP employee help BP comply with its duty to preserve all information potentially relevant to this matter, including but not limited to materials related to:
- The incident that took place on the *Deepwater Horizon* on April 20, 2010, including information related to the fire, explosion discharge or release of hydrocarbon **(including rate of discharge, methods used to calculate rate of discharge, cumulative amount of discharge, overall magnitude of spill and underwater plumes of oil)** and the causes of potential causes of the incident.

(GX 8I) (emphasis in the original).  Moreover, this same notice stated, "If potentially relevant voice mail or **text messages** on any mobile communication device are at risk of being erased due to time or space restrictions on the device, please contact a Data Collection Specialist. . . who will arrange for collection of the data."  (GX 8I).   This e-mail was confirmed as "accepted"  on August 4, 2010.  (GX 8).

Thus, clearly, by **July 28, 2010,** Mix had received notice that at his employer's instruction, he was obliged not to delete any text message that concerned flow rates.  In this LHO it again stated:

> At this point we are not requesting that anything be collected and provided to the Legal Group; rather we are requesting that no potentially relevant material be destroyed.  If potentially relevant voice mail or text messages on any mobile communication device are at risk of being erased due to time or space restrictions on the device, please contact a Data Collection Specialist at (281) 366-8170, who will arrange for collection of the data.  To evaluate whether any of your voice mail or text messages are at risk of being erased, please consult the relevant manual for your particular device.

*Id.*

On **September 22, 2010**, Mix was contacted by Robert Scheffler of Deloitte Financial Services ("Deloitte") concerning scheduling a document collection interview (GX 34A).  Mix was identified a person who might possess potentially relevant electronically stored information concerning the *Deepwater Horizon* response.  This missive informed Mix that Scheffler wanted to schedule a 15 to 20 minute interview to discuss what types of electronic data he had and where it was stored.  After the interview, Deloitte would begin the process of collecting the "relevant electronic data from your laptop."  In this e-mail, there was no specific mention of a phone or text messages.

On **September 23, 2010**, Mix received an e-mail from BP's Legal Department informing him that government investigations were ongoing, and specifically alerting him that **he could be served with a subpoena from a grand jury**.  GX 35.  Included in the e-mail were the statements:

- "As a result of this activity, government officials and employees ranging from federal or state agency employee, FBI agents or officials from various government commissions . . . may attempt to contact or interview you or a BP employee who reports to you at home or at the office."

- **"If you are served with a court order or grand jury subpoena seeking to require you to testify as a witness in court or before a grand jury, failure to comply with the terms of the subpoena or court order may subject you to**

**legal penalties**.  Being served with a subpoena or other court order requiring you to testify does not necessarily indicate that you are under investigation."

- "BP would prefer that you advise us if you have been served with a subpoena. . .seeking to interview you or compel your testimony. . . BP has retained attorneys, at its expense, to assist and advise employees like you. . . You can also request that such counsel advise you regarding the subpoena or court order and/or be present at the interview."

- "Any false statement made to government investigators, whether in an interview or in response to a subpoena could constitute a criminal offense."

(GX 35) (emphasis added).  Four days later, Patrick O'Bryan, a senior BP executive forwarded this e-mail to Mix again asking him, among others, to inform BP's Legal Department in the event that any of the consultants with whom Mix worked were contacted by the Department of Justice or the like.  (GX 36).

On **September 27, 2010**, Mix met with Frances Ho of Deloitte.  (Transcript at 1723).  At that meeting, Mix responded that he had reviewed the Legal Hold Order and the Revised or Refreshed Hold.  He also informed her that he had been involved in the early flow planning, well intercept and hydraulic kill plan, and the relief well planning.  (Transcript at 1725 and GX 37).  He stated then that he had relevant e-mails and that they had been archived in the Macondo folder. (Transcript at 1726).  Indeed, this interview focused primarily on data contained in his computer and e-mails and their retention.

He was asked if he had a BlackBerry/PD/cell phone that he used for company business and he informed her that he had an iPhone but indicated that he had no voicemails that would be relevant.  (Transcript at 1728).   In response to the question as to whether there were any other locations where potentially relevant electronically stored information per LHO definition might be save, his response was "no."  Nonetheless, he did indicate that there were hard documents

such as log books, procedure documents and calendars available for collection in his office. (Transcript 1730-31).

### D.      The Sprague/Mix String of Text Messages and Its Deletion

Between April 24, 2010 and August 5, 2010, Mix and Jonathon Sprague, his immediate supervisor and close personal friend, exchanged approximately 331 text messages.  Evidence was adduced, and it was never actually disputed, that Mix deleted this entire string at one time sometime **between  2:12 p.m. CST on October 4, 2010 through 6:43 p.m. CST on October 5, 2010.**  (Transcript at 1922, 2148) (Doc. 710-5 at 5).  From the foregoing discussion, it is also clear that these deletions occurred **after** having received all of the above-noted orders to retain such information, and that the materials Mix was on notice to retain included those concerning "the rate of discharge, methods used to calculate rate of discharge, cumulative amount of discharge, overall magnitude of spill"  as these were included in the July 28th Updated Legal Hold Order of which Mix acknowledge receipt on August 4th. (GX 8 and 8I).

In addition, it was clear that texts which occurred between April 26th through April 29th at 7:46 a.m. as well certain texts exchanged between Mix and Mr. Sprague on April 30, 2010 were unrecoverable. (Transcript at 576- 579). [7]      Evidence was adduced, as previously discussed,

---

[7]The Court delivered the following limiting instruction concerning the fact that these texts were unrecoverable:

        So you have seen and heard evidence that the government's expert was not able to recover 17 of the text messages between the defendant and Mr. Sprague.  You are instructed that you may consider the evidence amount the totality of all the evidence that you will hear and have heard and are seeing or will see in this case.

        You may also consider surrounding evidence to assist you in determining whether you believe the deletion of those 17 unrecoverable text messages is relevant or not to the crimes charge[d] here.

demonstrating that it was precisely during this time period that BP publically maintained that the flow was only 1000 BOPD, but Mr. Burch and Mix had generated estimates far exceeding these numbers.  Indeed, on April 22, 2010, calculations had rendered an estimate of 64,000 and 1110,000 BOPD.  Moreover, it was during the week of th 26th of April that Mix was asked to attempt to build a case where the flow model could match 1,000 BOPD and found that such a rate could only be obtained by grossly manipulating the size of the orifice through which the oil was flowing.  (Transcript at 967).   Then, after April 29, 2010, the Government increased the public flow rate estimate to 5,000 BOPD (Transcript at 981-82).

Also deleted were messages sent during the entirety of the Top Kill operation (Transcript at 586).  As Agent Bryson testified, these messages were relevant to the grand jury investigation because the Government had information that BP knew the flow rate was higher the 5000 BOPD and yet that information had not been adduced at the KWOP meeting.  (Transcript at 588).  The following messages which were transmitted on May 26, 2010 during the top Kill effort were recovered:

| Time | From | Message |
| --- | --- | --- |
| 1:42 p.m. | Sprague | Pumping now yes |
| 1:57 p.m. | Mix | No–pressured up between the test rams and vbr's right above them. Plan b. |
| 2:29 p.m. | Sprague | U gonna make 330 meeting |
| 2:32 p.m. | Mix | Pumping like hell but had a shutdown, getting ready.  To go another round |

You may not however, give undue importance to the 17 unrecovered text messages.  You must look at them in the context of this entire case.

Transcript at 576-77.  **Again, at no time was the indictment of BP or its having pleaded guilty to obstruction made known to the jury.**

14

| | | |
|---|---|---|
| 2:40 p.m. | Mix | Back to pumping like fuck and making headway |
| 2:41 p.m. | Sprague | Go get em |
| 3:19 p.m. | Sprague | Is it dead yet? |
| 3:22 p.m. | Sprague | Got an update for 330 |
| 3:38 p.m. | Mix | Still at high rates and trying to curve match but all the various rates have made this difficult |
| 3:47 p.m. | Sprague | R U hopeful |
| 4:37 p.m. | Mix | Stepping down now – really not sure |
| 5:08 p.m. | Mix | Still watching |
| 5:33 p.m. | Sprague | Down the casing? |
| 5:43 p.m. | Mix | Still watching |
| 8:08 p.m. | Mix | Evaluating the merits of the second kill attempt |
| 8:26 p.m. | Sprague | let me know if I can help |
| 8:28 p.m. | Sprague | What can I do to help wann talk? |
| 10:03 p.m. | Mix | No luck. Re-group–time to mardi gras mumbo |
| 10:25 p.m. | Mix | Too much flowrate–over 15000 and too large an orifice.  Pumped over 12800 bbl of mud today plus 5 separate bridging pills.  Tired . . . going home and getting ready for round three tomorrow. |

GX 3A.

Jeffrey Bolas, an expert in the field of digital forensic analysis, testified that the defendant had used a particular method of deleting text messages called "clearing a conversation."  To delete the text messages in the Sprague text message conversation, the defendant had to have executed a multi-stop process including the following:

- selecting the text message application on the iPhone (Transcript at 1959);

- selecting the Sprague text message conversation from all of the conversations listed on the defendant's iPhone (Transcript at 1959);

- hitting a button on the iPhone that says "Clear All," which has the effect of causing a prominent confirmation bar to appear that includes two buttons–one which was that reads "Clear Conversation" in a red bar and another which reads "Cancel" (Transcript at 1960, 2095);

- then hitting the "Clear Conversation" button (Transcript at 2095).

Thus, evidence was adduced that less than two weeks after Mix had been informed about the possibility of a grand jury subpoena (September 23, 2010; GX- 35) and his first interview with Deloitte concerning data collection (September 27, 2010), Mix deleted the Mix-Sprague string.

Defendant's counsel presented the jury with an explanation of this October 4-5, 2010 deletion.  Mr. Sprague had taken a picture of Mix during a meeting at 2:02 p.m. on October 4, 2010 and that picture was received by Mix via text message at 2:12 p.m. Central Daylight Time on October 4, 2010.  (Transcript at 2148).  Mr. Bolas testified that "any point in time within that window would be equally likely" as the precise moment of clearing."  (Transcript at 2240). Thus, there was testimony presented which provided this explanation that Mix had accidently deleting this string.

Only two other strings of deleted text conversations out of more than 100 text strings were found. (Transcript 1921).  The text string between Mix and his sister, Bridget Mix, was cleared on Feb. 23, 2011.  (Transcript at 1926). The other string between Mix and Wilson Arabie, was cleared on August 20, 2011. (Transcript at 1925).  The Arabie deletion was part of the subject of Count 2 of the Second Superseding Indictment of which Mix was acquitted.

**E.      August 22, 2011 Meeting**

16

On August 22, 2011, Mix again spoke by telephone with representatives from Deloitte concerning document collection.  (Transcript at 1804-05, 1809; GX 65).  Frances Ho interviewed Mix with Brenda Lee, BP's outside counsel, participating as well.  During this telephonic interview, Mix stated that he did not keep texts, that he deleted them because of build up and that he would delete them to make space. (Transcript at 1812-13)  Moreover, he told Ms. Lee that he did not think he had any text messages from the relevant time period that being from April 20, 2010 to August 10, 2010, but that he would "pull[ ] out his iPhone and would look at it,"  and that "there was nothing on there now for Macondo."  (Transcript at 1814-15).   After looking at the phone, he then told them that there were some relevant messages. (Transcript at 1815).  He then summarized these messages which Ms. Lee recorded as "Residual messages back to 4/24/10–Dynamic Kill; 7/19/10–Gas Samples and 8/27/10–preliminary analysis static kill." (Transcript at 1816).  He also stated that his text messages were not very substantive and most substantive conversations would have been over e-mail.  (Transcript at 1817).  He also stated that it was possible that other flow rate related texts were deleted and that he had tried to stick to the recommended official guidelines.  (Transcript at 1818).  He state that he texted probably only for meetings.  (Transcript at 1818).  He did not state at that time that he had deleted a conversation string between him and Mr. Sprague, his immediate superior, which contained texts made during the relevant period.

### F.      Evidence Presented of Retained Materials

Vincent Piarulli, an employee of the defendant's law firm,  processed a forensic hard drive of Kurt Mix's laptop which had been imaged by Deloitte in August of 2011.  Mr. Piarulli

testified that Mix's BP laptop computer contained 8100 e-mails; if he included attachments thereto, there were about 13,200 documents. (Transcript at 2505).  He also testified that there were approximately 1400 documents on the Macondo folder on the C drive of Mix's computer including Word documents, PDFs and PowerPoint images.  About 40 exhibits were called up at trial, and others later admitted globally; they were admitted for non-hearsay purposes to prove Kurt Mix's state of mind, "namely that Mr. Mix preserved and archived in the 'Macondo' folder on his BP laptop" hundreds of additional documents.  (Rec. Doc. 690, n. 1 and Transcript at 2559-2562).

With this as background, the Court will now turn to legal issues presented by the instant motion.

## II.     LEGAL ANALYSIS

### A.  Standard of Review

The Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781 (1979)[8] described the court's scope of review under Fed. R. Civ. P. 29 as follows:

> The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See *Johnson v. Louisiana*, 406 U.S., at 362, 92 S.Ct., at 1624-1625.  This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence and to draw reasonable inferences from basic facts to ultimate facts.  Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered

---

[8]In *United States v.Vargas-Ocampo*, ____ F.3d ____, 2014 WL 1303364 (5th Cir. March 26, 2014), the Fifth Circuit in its rehearing en banc has clearly held that the use of the "equipoise rule" was not appropriate in reviewing convictions for sufficiency of evidence, abrogating *United States v. Jarmillo*, 42 F.3d 920, 923 (5th Cir. 1995).  Accordingly, the Court will embrace this approach.

in the light most favorable to the prosecution.  The criterion thus impinges upon "jury" discretion only to the extent necessary to guarantee the fundamental protection of due process of law.

*Id.* at 319, 2789 (emphasis provided);  *United States v. Valle*, 538 F.3d 341, 344 (5th Cir. 2008); *United States v. Little,* 2012 WL 2906663 (W.D.La. July 13, 2012) (Foote, J.), *aff'd* 538 Fed.Appx.379 (5th Cir. August 6, 2013).

As aptly summarized by Judge Foote:

"In effect, the court assumes the truth of the evidence offered by the prosecution."  *United States* v. *Robertson,* 110 F.3d 1113, 1117 (5th Cir. 1997). The Court reviews the sufficiency of circumstantial evidence in the same manner that it reviews the sufficiency of direct evidence.  *See United States v. DeJean*, 613 F.2d 1356, 1358 (5th Cir. 1980).  Moreover, "[a]ll evidence is considered, not just the evidence supporting the verdict, but the evidence need not conclusively disprove alternatives; the jury is free to choose among reasonable constructions of the evidence."  *United States v. Peterson*, 244 F.3d 385, 389 (5th Cir. 2001) (internal marks omitted).  "The evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt. . . *United States v. Lopez*, 74 F.3d 575, 577 (5th Cir. 1996). "Circumstances altogether inconclusive, if separately considered, may, by their number and joint operation, especially when corroborated by moral coincidences, be sufficient to constitute conclusive proof."  *United States v. Vasquez*, 677 F.3d 685, 692 (5th Cir. 2012).  "Jurors may properly 'use their common sense' and 'evaluate the facts in light of their common knowledge of the natural tendencies and inclinations of human beings.'"  *Id.*  (quoting *United States v. Ayala*, 887 F.2d 62, 67 (5th Cir. 1989)).
        There, this Court will not weigh the evidence or assess the credibility of witnesses, *Lopez*, 74 F.3d at 577, but rather should determine "ony whether the jury made a rational decision, not whether its verdict was correct on the issue of guilt or innocence."  *United States v. Dean*, 59 F.3d 1479, 1484 (5th Cir. 1995).

*Little*, at * 1-2.

## B.  The Verdict

Mix  was convicted by a jury on Count 1 and acquitted on Count 2 of a two count Second Superseding Indictment for obstruction of justice in violation of 18 U.S.C. § 1512(c)(1).  (Rec. Doc. 424)  Count 1 charged specifically:

> On or about October 4, 2010, in New Orleans, Louisiana, in the Eastern District of Louisiana and elsewhere, Defendant KURT MIX did corruptly alter, destroy, mutilate, and conceal, a record and object: namely, electronic data contained within an electronic device, to wit: an iPhone containing text messages with SUPERVISOR, and attempted to do so, with the intent to impair its integrity and availability for use in an official proceeding, to wit: a federal grand jury proceeding in the Eastern District of Louisiana.

*Id.* The four elements that the Government was charged with proving beyond a reasonable

doubt were:

> *First:* That, on either October 4 or 5, 2010, Mr. Mix intentionally altered, destroyed or mutilated the text messages that he had exchanged with Jonathon Sprague who was referred to as SUPERVISOR in the indictment;
>
> *Second:* That he did so "corruptly," that is, knowingly and dishonestly and with the specific intent to subvert or undermine the due administration of justice by a pending or reasonably foreseen grand jury in the Eastern District of Louisiana;
>
> *Third:* That grand jury proceeding did not have to be pending at the time of the alleged wrongful acts, but if not pending, it must have been reasonably foreseen by the defendant.
>
> *Fourth*: That the natural and probable effect of his actions was to impede the due administration of justice by a grand jury in the Eastern District of Louisiana, and that he knew that this would be the natural and probable effect of his actions.

(Transcript at 2755-56); *United States v. Simpson*, 741 F.3d 539, 551 (5th Cir. 2014). Using the

standard as set forth above, the Court finds that Government offered sufficient proof that the jury

made a rational decision in rendering a guilty verdict as to Count 1.

## C.    The Standard Was Met

### 1.    First Element–Intentionally Deleted Text Messages

As outlined in detail above, considering the testimony of Jeffrey Bolas and Agent Kelly

Bryson, a reasonable jury could find beyond a reasonable doubt that Mix intentionally deleted a

string of text messages between Jonathon Sprague and himself.  The Government produced

documentary evidence and testimony demonstrating that between April 24, 2010 and August 5,

2010, Mix and Jonathon Sprague exchanged approximately 331 text messages.  The period of

time this string covered included the run-up to Top Kill–the time that Mr. Burch demonstrated

that Mr. Mix knew that the flow rates were greater than those reported by his employer, BP.

Based on his expertise, Mr. Bolas testified unequivocally that this entire string was deleted at

one time, sometime between  2:12 p.m. CST on October 4, 2010 through 6:43 p.m. CST on

October 5, 2010.  This action clearly occurred after Mix was informed that flow rates were an

issue being investigated as to BP and after he was on notice to retain all materials concerning

"the rate of discharge, methods used to calculate rate of discharge, cumulative amount of

discharge, overall magnitude of spill."  (GX 8 and 8I,  July 28th Updated Legal Hold Order of

which Mix acknowledge receipt on August 4th).

   Also demonstrated was those texts which were exchanged between  April 26th through

April 29th at 7:46 a.m. as well certain texts exchanged between Mix and Mr. Sprague on April

30, 2010,  a crucial time period when Mr. Burch and Mix were finding flow rate estimates after

April 23rd and the collapse of the riser in the range of high-50,000 to low-70,000 BOPD.

(Transcript at 955).  Mr. Burch was questioning BP's public stance and Mix was telling him that

they "were not to push back to BP about those numbers"  and that the "official company motto is

1000 BOPD" (Transcript 962-66).  In fact it was sometime during the week of th 26th of April,

that Mix was asked to attempt to build a case where the flow model could match 1,000 BOPD.

(Transcript at 967).  These circumstances provide circumstantial evidence supporting the

conclusion that these texts were concerned with trying to create a model that would match what

appeared to be an insupportable public position on the part of BP.

21

Again April 30th is significant because  it was on April 29th  that the Government increased its public flow rate estimate to 5,000 BOPD (Transcript at 981-82) with which estimate Mr. Burch also disagreed.   Mr. Burch in fact testified that he had discussed this with Mix who responded, "Those are the numbers being reported and it's not our job to take that mission on."  (Transcript at 982).  Mix was a BP employee whose supervisor was Jonathon Sprague.  Based on the circumstantial evidence, a jury could reasonably find that Mix and Sprague were concerned as to the contents of those texts and discussions concerning BP's public position versus its private knowledge, and that they wanted these discussions forever erased.  Indeed, if so, they succeeded in that endeavor.

Mr. Bolas also testified convincingly that a deletion of this nature would have required a number of steps on an iPhone making the concept of an accidental deletion unlikely.  Moreover, there was no evidence presented indicating that anyone other than Mix had dominion over his cell phone.  Circumstantial evidence is given equal weight as direct evidence.  *United States v. Gonzales*, 79 F.3d 413, 243 (5th Cir. 1996); defendant's arguments to the contrary are unavailing.


### 2.        Second Element–Corrupt Intent

Viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that Mix acted knowingly and dishonestly and with the specific intent to subvert or undermine the due administration of justice when Kurt Mix deleted the Sprague-Mix text string.  To begin, the LHOs  outlined in detail above clearly provide circumstantial evidence of corrupt intent.  Mix knew that information concerning flow rates and  discussions with Sprague concerning those rates were the subject of inquiry.  Mix acknowledged receipt of five LHOs (April 22, 2010, May 3, 2010, May 25, 2010, July 2, 2010,

July 28, 2010) prior to the deletion of the string and one after (July 28, 2011).  He certified that he had read and understood them and that he would comply with their requirements. (GX-8, 8R and Transcript 897-99). The testimony of Kenneth Prine, discovery counsel for BP, underscored these facts for the jury.

Moreover, it was clear that these hold orders included text messaging and that if there were an issue with deletion thereof because of a storage problem, Mix was to contact the appropriate person at BP so that the texts would be saved.  There was no evidence that he did so or expressed any concern about "build-up" to the appropriate person.

In addition, the  May 25, 2010, (GX 8F) and July 2, 2010 (GX 8G)  LHOs specifically delineated that the electronically stored subject matter included in relevant part damages caused by hydrocarbon discharge and BP's compliance with the Oil Pollution Act and Clean Water Act and any associated rules, orders or regulations which implicate oil flow rates.  Moreover, the July 28, 2010 LHO specifically stated that the law required BP employees to assist in the preservation of all information relevant to the rate of discharge, the methods used  methods used to calculate rate of discharge, cumulative amount of discharge, overall magnitude of spill and underwater plumes of oil. (GX 8I).

By September 23, 2010, Mix was on notice that he could be served with a subpoena from a grand jury.  GX 35.   He was specifically told that any false statement made to government investigators, whether in an interview or in response to a subpoena could constitute a criminal offense.  (GX 35).   Five days later, Patrick O'Bryan, a senior BP executive forwarded this e-mail to Mix again asking him to inform BP's Legal Department in the event that any of the consultants with whom Mix worked were contacted by the Department of Justice or the like. (GX 36).

Moreover, it is clear that he was less than forthcoming in the August 22, 2011 telephone meeting.  He told the interviewers that that he did not keep texts, that he deleted them because of build up and that he would delete them to make space. (Transcript at 1812-13).  But, it was also demonstrated that he had used only a minimal amount of the storage space of his iPhone making this explanation implausible.  In addition, evidence demonstrated unequivocally that he had only deleted 3 text strings (one with Mr. Sprague, one with his sister and one with Wilson Arabie).  All of these recipients were friends or relations with whom there could have been more candid discussions concerning the flow rate issue and the public statements of BP.

While he did inform the interviewers that there were some relevant messages that dated from April 24, 2010 and August 27, 2010,  (Transcript at 1816), he also stated that his text messages were not very substantive. While he stated that it was possible that other flow rate related texts had been deleted, he also opined that he had tried to stick to the recommended official guidelines.  (Transcript at 1818).  He also told the interviewers that he probably texted only for meetings.  (Transcript at 1818).  This statement was blatantly contradicted when the jury was shown part of the Sprague-Mix text string quoted above which contained details of activity during the Top Kill operation itself.  Moreover, at that interview, he failed to tell them that he had deleted that conversation string between him and Mr. Sprague, his immediate superior, which contained texts made during the relevant period.

The evidence of this kind of prevarication on the part of Mix certainly constitutes circumstantial evidence that supports the jury's verdict.  Clearly, the deleted string was relevant to the grand jury investigation.  The Government in the grand jury sought information that BP knew the flow rate was higher the 5000 BOPD.

### 3.      Third Element–Reasonably Foreseen Grand Jury

As has been stated a number of times above, Kurt Mix was on notice that the Government was investigating BP's action both pre- and post-blow-out.  Agent Bryson's testimony concerning materials retrieved demonstrated this fact.   (Transcript at 627-645).

For example,  GX-35 which was the afore-mentioned e-mail sent on September 23, 2010, less than two weeks before Mix's relevant deletion,  Mix received an e-mail from BP's Legal Department alerting him to the government investigations concerning the *Deep Water Horizon* incident; notifying him that he could be contacted by government officials and employees including FBI agents; noting that he could be served with a subpoena from a grand jury and what he should do should that occur; and informing him that failure to comply with the terms of a subpoena or court order could subject him to legal penalties. (GX 35) (Transcript 627-632).

GX-45 was also introduced.  This document was Kurt Mix's Responder Logbook dated September 14, 2010.  At page 5 in Mix's own notes taken at a meeting with Patrick O'Bryan, a senior BP executive and another of Mix's supervisors, it states, "legal Supenoa's (sic) not allowed to discuss outside BP."  That particular entry is dated September 24, 2010, the day after the September 23rd e-mail. (GX-45) (Transcript 632-633).

GX-36  was also presented to the jury.  This document was an email from Patrick O'Bryan dated September 27, 2010, forwarding the September 23rd e-mail four days later.  In this email, O'Bryan requests its five recipients to inform BP's Legal Department in the event that any of the consultants with they worked were contacted by the Department of Justice or the like. (GX 36) (Transcript 638-40).

Moreover, the jury was informed that there had been  a public announcement by the Attorney General of the United States of the establishment of a criminal investigation into the oil

spill on June 1, 2010.[9]  A reasonable jury could find this a further circumstantial evidence that

Mix foresaw the convening of a grand jury to which he would be subject to its subpoena powers.

In conjunction with the afore-described LHOs,  viewing the evidence in the light most favorable

to the prosecution, a  jury could have found beyond a reasonable doubt that Mix could

reasonably have foreseen that a grand jury would be impaneled.[10]


### 4.       Fourth Element–Nexus to The Foreseeable Grand Jury Proceeding

"Before a defendant may be convicted of obstruction under § 1512(c)(1), he must believe

that his acts will be likely to affect a pending or foreseeable proceeding."  *United States v.*

*Matthews*, 505 F.3d 698, 708 (5th Cir.  2007), citing *ArthurAndersen*, 544 U.S. at 707, 125 S.  Ct.

2129; *United States v.  Kaplan,* 490 F.3d 110, 125 (2d Cir.  2007) ("[A] 'knowingly . . . corrupt

persuader' must believe that his actions are likely to affect a particular, existing or foreseeable

official proceeding."); *United States v. Mix*, 2013 WL 5588317, *6 (E.D.La. October 10, 2013).

As this Court has previously noted with respect to the nexus requirement, the deletion must bear

some relation in time, causation or logic to the judicial proceeding.  *Id.* at *2.  Furthermore,

materiality is not an element of the offense as the Court has repeatedly held. (Doc. 260 at 6; Doc.

512, Transcript of 11/8/12 Hearing at 124).  Thus, there was sufficient evidence presented such

that a reasonable jury could have found that the natural and probable effect of Mix's actions was

---

[9] Mix's counsel's argues that "The only evidence on this point was Agent Bryson's hearsay testimony.  The Court allowed such hearsay from Agent Bryson not for the truth of the matter asserted, but only to explain Bryson's own understanding and the effect that it had on her investigation.  *See* Trial Tr. 555:20-24, 557:11-14, 567:20-25." (Doc. 710-5 at 69 n.20).  The citations have nothing to do with the testimony concerning the Holder announcement.  There was never an objection made to Agent Bryson's testimony concerning the Holder announcement.  The objections cited concerned totally unrelated matters such as the SEC subpoena and the forensic examination of the iPhone.

[10] It is irrelevant that the grand jury was impaneled **after** Mix's deletion.  "For purposes of this section . . . an official proceeding need not be pending or about to be instituted at the time of the offense."  18 U.S.C. § 1512(f).

to impede the due administration of justice by a grand jury and that he knew that this would be the natural and probable effect of his actions.

Agent Bryson's testimony, as previously outlined, demonstrated that many of the deleted text Sprague-Mix messages were directly relevant to the matters under investigation. (Transcript at 572, 581, 584-85, 592). The deleted, unrecoverable texts, which occurred between April 26th through April 29th at 7:46 a.m. as well on April 30, 2010, were exchanged during the time period that BP publically maintained that the flow was only 1000 BOPD.  Mix had been involved in the generation of estimates that far exceeding that  public announcement by BP.   Again it was also around this time that Mix was tasked with attempting to create a flow model that could match 1,000 BOPD.  (Transcript at 967).

In addition, the deleted messages generated during the Top Kill operation (May 26-28, 2010) were relevant to the grand jury investigation because the Government had information that BP knew the flow rate was higher the 5000 BOPD, and yet BP recommended that Top Kill proceed knowing that with a the flow rate over 15,000, the procedure would fail.  (Transcript at 586- 592).  There were candid discussions concerning discussing the flow rate being over 15,000 BOPD in these deleted, but recovered texts.

Another fact established at trial was that the only string which was deleted on October 4-5, 2010 was that of Mr. Sprague's.  These texts were between Mix and his supervisor who was also his close personal friend.  Agent Bryson discussed at trial her finding that generally people text a little more like they are having a conversation–that a text is a little closer to a conversation than an e-mail.  Thus, a jury had an evidentiary basis to believe that the deleted texts contained materials that Mix intended to keep from a foreseen grand jury.  (Transcript at 590-91).

The timing of the deletions add to the nexus finding.  Less than two weeks before Mix made these deletions, he was specifically told about the possibility of a grand jury investigation and other governmental inquiries.  (GX 35 and 36).  All of these facts and reasonable inferences provided  a reasonable jury to find the nexus requirement established beyond a reasonable doubt. *United States v. Ahrensfield*, 698 F.3d 1310, 1325 (10th Cir. 2012).

###   D.     Venue

Kurt Mix now claims that the Government failed to establish proper venue.  The first opportunity that Mix raised venue as an issue was at the close of all the evidence on December 14, 2014 when he requested a jury charge to cover this issue.  The Court denied that request at the time of trial because the Court found the issue had been waived.  At this time, the Court still finds no merit in Mix's contention concerning venue.

"Defects relating to venue generally are waived unless asserted prior to trial. *United States v. Delgado-Nunez*, 295 F.3d 494 (5th Cir. 2002); *United States v. Carreon-Palacio*,267 F.3d 381, 391 n.25 (5th Cir. 2001).  The exception to this rule arises where the impropriety of venue only becomes apparent at the close of the government's case.  *Delgado-Nunez*, 295 F.3d at 497.  Clearly, in this instance, Mix was well aware that the deletion of the subject text occurred in Houston, Texas, not in Louisiana.  Moreover, as the record bears, there were numerous motions to dismiss raised prior to trial; this issue was never raised.

Finally, the evidence presented was sufficient for the jury to find venue.  The venue provision for §1512  provides, "A prosecution under this section or section 1503 may be brought in the district in which the official proceeding (whether or not pending or about to be instituted) was intended to be affected or in the district in which the conduct constituting the alleged offense occurred."  28 U.S.C. §1512(i).   Moreover, venue is a question of fact that the government must

prove only by a preponderance of the evidence.  *United States v. Lukashov*, 695 F.3d 1107, 1120 (9th Cir. 2012); *United States v. Garcia Mendoza*, 587 F.3d 682, 686 (5th Cir. 2009) ("We affirm a verdict if, viewing all the evidence in the light most favorable to the government, a rational jury could conclude, from  the evidence presented at trial, that the government established venue by a preponderance of the evidence.").

Agent Bryson testified about the *Deepwater Horizon* incident  (Transcript at 554-557), and that there was a Grand Jury impaneled in New Orleans, in the Eastern District of Louisiana. (Transcript at 559-60).  Moreover the Legal Hold Orders specifically stated that the incident occurred 41 miles offshore of Louisiana, thus the grounds for this argument were well-known to the defendant before trial.  The Eastern District of Louisiana was thus "the district in which the official proceeding (whether or not pending or about to be instituted)."   Under the clear language of the statute, venue was established by the Government.  *See United States v. Gonzalez*, 922 F.2D 1044, 1054 (2d Cir. 1991).

Accordingly, based on the foregoing, Defendant's Rule 29 Motion for a Judgment of Acquittal (Doc. 710) is **DENIED**  and Defendant's Motion for a Judgment of Acquital (sic) (Doc. 679) is **DISMISSED** as being superseded by Document 710.

New Orleans, Louisiana, this   12th  day of June, 2014.

**STANWOOD R.  DUVAL, JR.**
**UNITED STATES DISTRICT COURT JUDGE**