## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

**UNITED STATES OF AMERICA**                                      **CRIMINAL ACTION**

**VERSUS**                                                                       **NO. 12-171**

**KURT E. MIX**                                                            **SECTION "K"(1)**


### ORDER AND REASONS

Before the Court is "Kurt Mix's Rule 33 Motion for an Order Vacating the Jury's Verdict and Granting a New Trial Due to Juror Misconduct." (Doc. 706).  Kurt Mix ("Mix") contends that as a result of  certain juror misconduct, Mix was denied his constitutional right to an impartial jury as guaranteed by the Sixth Amendment to the United States Constitution.  While it is clear as delineated below that there was an infusion of external information into the jury's deliberations, the Court must determine  (1) whether the Court should consider this information because of the nature of the material and the method by which Mix's counsel obtained it and (2) whether the extrinsic information would have affected the jury's deliberations and the verdict.

As this Court stated at the hearing on this motion, there are two conflicting tensions present in the matter before the Court.  One tension is the judicial aversion to, if not prohibition of, counsel's post-trial interviewing of jurors without the Court's supervision, particularly as it relates to their deliberations.  *See* Fed. R. Evid. 606(b); *United States v. Kepreos*, 759 F.2d 961 (1st Cir. 1985). The basis for its disfavor, which was explained by the United States Court of Appeals for the First Circuit in 1985 and which holding remains the rule in that circuit to date, stems from the potential for upending the jury system.  As the First Circuit stated:

> [T]his Circuit prohibits the post-verdict interview of jurors by counsel, litigants or
> their agents except under the supervision of the district court, and then only in
> such extraordinary situations as are deemed appropriate.  Permitting the unbridle
> interviewing of jurors could easily lead to their harassment, to the exploitation of

> their thought processes, and to diminished confidence in jury verdicts, as well as
> to unbalanced trial results depending unduly on the relative resources of the
> parties. [citations omitted]. Such outcomes, or even the appearance of the same,
> we are not willing to tolerate.

*Id.* at 967. The Court's duty essentially is to protect the jury system. The countervailing tension

rests with the Court's duty to the defendant to consider carefully the circumstances and effect of

the extraneous information that was clearly imparted to the jury. For the reasons that follow, the

Court finds the motion to have merit.

I.      **BACKGROUND**

        A.      **Instructions Concerning Extraneous Prejudicial Information**

        Trial on a Second Superseding Indictment based on two counts of obstruction of justice

commenced against Kurt Mix on December 2, 2013. After the jury was selected and seated, the

Court gave its preliminary instructions which included the following admonition:

> Further, you, as jurors, should avoid allowing yourselves to be placed in a
> position when outside the courtroom where discussions of the case may be being
> conducted by any of the parties to the trial.
> Furthermore the attorneys, the defendant, the witnesses and other persons
> who may be observing the trial or are connected with it in any way must be
> particularly careful not to discuss and shall not discuss the case where there is a
> possibility that you, the jurors, may hear their remarks. **If such occurs, please
> notify me immediately.**

(Trial Transcript at 465-66). The Court reiterated if anyone were to approach a juror to talk

about the case, a juror was not to tell the jury of this action, but was to advise the Court

immediately by giving a signed note to the marshal to give to the undersigned. Trial Transcript at

524). Moreover, throughout the proceedings the jury was instructed on no account to discuss the

case with anyone and to not look at any extraneous information concerning the case. The Court

2

never received any notice of any overheard communication during the trial or during the deliberations.

### B.   The Extraneous Prejudicial Information That Was Improperly Brought to the Jury's Attention and Attorney Interviews of Jurors Without Leave of Court or Court Supervision.

On December 16th, the jury was charged and began its consideration of the case at 3:45 p.m.  After about one hour, the jury determined that it would return the next day.  Deliberations continued on the 17th of December and at 4:05 p.m., the jury sent a note to the undersigned which stated, "We are at a standstill (deadlocked) since before lunch.  Any advice?"  (Doc. 702-2 at 10 of 10).  After consulting with counsel, the Court then gave the jury a modified *Allen* charge at which time, the jury resumed its deliberations.  Court adjourned at 5:11 p.m.  Deliberations resumed at 9:00 a.m. on the 18th of December, and the jury returned a verdict at 10:00 a.m. convicting Mix as to Count 1 and acquitting him as to Count 2 of the Second Superseding Indictment.

After the verdict was read, the Court stated in open court:

Under no circumstances, except by court order, shall any juror who may consent to be interviewed disclose any information with respect to the following:

\*      the specific vote of any juror other than the juror being interviewed or

**\*      the deliberations of the jury or**

**\*      for the purpose of obtaining evidence of improprieties in the jury's deliberations**

(Transcript at 2802) (emphasis added).

Mix's counsel described their next step as follows at a hearing on this motion:

There was an interest and it was a counsel interest in getting feedback. We were surprised and taken aback, frankly, by the jury's verdict.  We were

> devastated by it, it was unexpected, and there was an interest in understanding
> where we had gone wrong as counsel.  That is what led to the contacts with the
> jurors.

(Transcript of Hearing of 3/13/14, Joan McPhee at 25) ("3/13 Transcript").    The timing of the

contact and actual discussion with jurors is unclear.  In the briefing, there is no clear-cut date

given as to when the first calls to the jurors were made.   According to statements made in Court,

the first communication was with Juror No. 6; a phone call was made; Juror No. 6 returned that

phone call and that was the first contact. (3/13 Transcript at 30:21-23).  Mr. Marshall attested in

his affidavit that he had a brief conversation with Juror No. 10[1] on December 19, 2013.  Thus, it

would appear that these "initial" conversations occurred on **Thursday, December 19, 2013.**[2]

In the instance of Juror No. 6, counsel for Mix stated in the subject memorandum that

Juror No. 6 at the time of the phone conversation:

> without being asked whether there had been any jury misconduct, the juror
> revealed to defense counsel that, after the Court gave the jury the modified *Allen*
> charge on the afternoon of Tuesday, December 17, 2013, and while the jury was
> still deliberating, [Juror No. 1] told the 11 jurors that he/she had overheard an
> extraneous conversation "in the elevator" of the courthouse; that what he/she had
> overheard had been "weighing" on him/her; and that, based on what he/she had
> overheard, he/she would "not lose any sleep" over voting guilty.  The juror further
> informed defense counsel that, although several jurors urged [Juror No. 1] not to
> reveal precisely what he/she had overhear "in the elevator," it was clear from
> [Juror No. 1's] comments that he/she considered this extraneous information so
> inculpatory of Mr. Mix that it gave him/her certainty and comfort in voting

---

[1]It was agreed that for purposes of privacy, the juror numbers would be used in lieu of
names.  In Mr. Marshall's affidavit, the juror number identified in Paragraph number 4 should be
"10" not "11."

[2]In the memorandum in support of the motion, it is stated,"After trial, defense counsel contacted several
jurors, more than one of whom agreed to speak with defense counsel at some length.  The first juror to do so called
defense counsel on the telephone, **in response to a voicemail that defense counsel left for the juror the previous
day.**"  (Doc. 706-1 at 6 of 17) (emphasis added).  No specific dates are provided in this narrative.  If Juror No. 6 was
the first person to whom  counsel spoke, and Juror No. 10 spoke to counsel **after** her, then the Court must assume
that these calls were made **immediately after trial** which makes counsel's attestations of extensive research as to the
propriety of these conversations more questionable.

"guilty" on Count One.  At that point, defense counsel asked whether the juror would be agreeable to further conversations, and the juror stated that he/she was agreeable.

(Doc. 706-1 at 7 of 17).  After this conversation, counsel for defendant Mix neither informed the Court nor the Government of this obvious problem.

Juror No. 6 did indeed meet with counsel a few days later culminating with her signing an affidavit sometime on **Monday,  December 23, 2013.**  Of the 13 paragraphs this affidavit contains, the Court has stricken 7 paragraphs[3] as they specifically contain information concerning the deliberations of the jury itself and as such are strictly forbidden to be discussed.[4] (Doc. 706-5 at pp. 2-5)  Again, even after **this** meeting, the Court was not contacted.

As to Juror No. 10, Mr. Marshall attested that on December 19, 2013, he had a brief telephone conversation with that juror and that Juror No. 10 stated:

> On the evening of Tuesday December 17, 2013, shortly before the jury adjourned for the day, [Juror No. 1] stated to the jurors that she was not going to lose any sleep over returning a guilty verdict in this case because of something she overheard in the elevator during the course of her jury service.  When [Juror No. 1] made this announcement to the jurors, some of the jurors vocally requested that [Juror No. 1] not reveal what she had overheard.

 (Doc. 706-5 at pp. 7-8).  Again, the Court was not contacted. Again this affidavit contained two paragraphs of prohibited information concerning deliberations which the Court has stricken from the record.[5]

On **January 2, 2014, fourteen days after these disclosures were made**, defense counsel filed the instant motion providing the Court (1) its first notice of the issue of extraneous

---

[3]Doc. 717 (filed under seal).

[4]Fed. R. Evid. 606(b).

[5]Doc. 717 (filed under seal).

information being improperly brought to the jury's attention, as well as (2) its first notice that defense counsel had contacted these individuals without leave of Court and had discussed not only the extraneous information entering the jury's deliberations but information concerning the deliberations themselves.  Throughout the prosecution and trial of this matter, the Court made itself available to all counsel through e-mail and personal mobile phone contact at any time day or night, regardless of whether such contact was needed during the week or the weekend.  All counsel had availed themselves of this ease of contact throughout the trial which makes counsel's failure to communicate to the Court in a timely fashion truly remarkable and frankly baffling to the Court.

On **January 9, 2014,** this Court entered an order which noted that under Local Rule 47.5[6] only by leave of Court upon motion for good cause shown may an attorney examine or interview any juror.  Moreover, the Court noted that the relevant part of that local rule provides that jurors are prohibited from disclosing any information concerning, *inter alia*, jury deliberations or evidence of improprieties in those deliberations except as to whether extraneous prejudicial information was improperly brought to the juror's attention.[7]  The Court also noted the Fifth Circuit's general hostility toward the practice of post-trial juror interviews.  Moreover, the Court stated that it had particularly instructed the jurors to refrain from discussing their deliberations in any manner.  Nonetheless, and noting that counsel are officers of the Court, counsel in essence

[6]Counsel for Mix makes much of the position that this local rule is contained in the "civil" portion of the local rules and thus does not apply to criminal actions.  This position is incorrect; these rules apply to both civil and criminal matters.  Certainly with respect to this section of the Court, a Westlaw search would have demonstrated that as to juror interviews, the Court has invoked L.R. 47.5 as the proper procedure to pursue this avenue.  *United States v. Smith*, 2000 WL 257459 (E.D.La. March 2, 2000).

[7]This observation was based on the fact, as previously noted, that a substantial amount of the affidavits filed concerned prohibited information–that is specifically concerning jury deliberations.  Obviously, pursuant to Fed. R. Evid. 606, it is for this reason these paragraphs were stricken.

aided and abetted these jurors in disobeying the Court's orders.  As such, the Court expressed

concern and sought briefing on the effect of these defalcations.  (Doc. 709).  Nonetheless,

because from the affidavits it was clear that Juror No. 1 had clearly injected extraneous

information into the deliberations at a critical juncture and that her actions were in direct

contravention of the Court's numerous instructions, the Court determined that it must interview

the jurors to obtain a clean, clear record of the circumstances surrounding Juror No. 1's actions.

On **January 14, 2014,** the Court entered an order for to the Clerk of Court to give proper

notice to the twelve jurors who rendered the verdict in this case to be present in court on

Thursday, January 23, 2014 at 9:00 a.m.  Each juror was informed that he or she would be

interviewed separately and briefly in a sealed proceeding at that time.  The jurors were also

ordered not to communicate with each other or any person acting on behalf of any of the parties

to this proceeding.

A Motion for Recusal (Doc. 720) which is the subject of another order was filed on

January 21, 2014.  (See  Doc. 748 Order and Reasons issued February 13, 2014).

At **12:24 a.m. on January 23, 2014,** counsel for Mix filed "Defendant's Ex Parte Motion

and Incorporated Memorandum to Stay Proceedings" (Doc.  721), seeking to stay the Court's

interviewing of  the jurors "and all other non-ministerial proceedings not related to Defendant's

Motion for Recusal."  The Court denied this motion orally at the opening of the hearing.

(Transcript of 1/23/14, Juror Interview, Doc. 813 at 4).  In a written opinion entered on January

27, 2014, the Court found that the motion had been improperly filed as an *ex parte* motion

(which indicates that there is no opposition to that motion), because counsel for the United

States'  had made clear that it would oppose any stay in a conference call that had been held at

5:10 p.m. on January 21, 2014, wherein the Court and the parties discussed defense counsel's position which was memorialized in Kurt Mix's Motion for Recusal (Doc. 720).   The Court continued:

> Moreover, as to the merits of staying the interviewing of these jurors, as stated by the Court on the morning on January 23, 2014, it was and is imperative to the operation of justice and for the defendant that the jurors be interviewed and their recollections as to extraneous material brought their attention be examined and memorialized as swiftly as possible.  Clearly to have granted this motion would have be adverse to the interest of **the defendant himself**, not only the Government, as it is axiomatic that memory becomes less vivid with the passage of time.  Finally, the Court finds that in the interest of justice, it will not stay consideration of any of the motions that are presently pending before the Court. On January 23, 2014, the examination of the jury as to the issue of extraneous prejudicial materials being introduced into the jury occurred.[8]

"When 'a colorable showing of extrinsic influence appears, a court must investigate the asserted impropriety.'"  *United States v. Ruggiero,* 56 F.3d 647, 652 (5th Cir.  1995), citing, *United States v. Winkel*, 587 F2d , 705, 714 (5th Cir.  ), *cert.  denied,* 444 U.S. 827 1979).  As the Court made clear at the commencement of the hearings, the inquiry was limited under the dictates of Fed. R. Evid. 606(b).  On no account would the Court inquire as to the effect of the alleged statement of Juror No. 1 to the jury. And so, the hearing was held.

### C.    The Court's Juror Interviews

Juror No. 1 testified that she had heard something on the elevator from a non-juror and that she later related to the jury that she had heard something.  She then denied that she had told

---

[8] (Doc. 726) filed under seal.  It is interesting to note that counsel for Mix lauded the Court for the swift and thorough manner in which it conducted the juror interviews at the subsequent hearing on this motion. (Transcript of 1/23/14, Juror Interview, Doc. 813 at7).

the jurors that because of what she heard, the "weight of voting guilty was gone."  Transcript of

1/23/14, Juror Interview, Doc. 813 at 9).  She testified that she had heard that "there were going

to be more than one case.  It wasn't just Kurt Mix who was going to be brought to trial."  She did

not know who had stated this.  She heard this two days before deliberations. After the Court

informed her that other jurors had a different recollection, she reiterated that she was 100 percent

certain that she had not conveyed this conversation to her fellow jurors.  She further testified,

"And also, there was no talk of whether it was helping me decide he was guilty or not guilty."

She further opined."I was just like, 'Oh, I can't believe I heard something.  This sucks.  I want it

out of my brain."  Transcript, Juror Interview, Doc. 813 at  10) .  She then stated that she did not

remember having heard the instruction that in the event she overheard something, she was to

report that circumstance to the Court. *Id.* at 11.

On further questioning, she then testified that she told the rest of the jurors on "the day

they deliberated all day"[9]  Specifically she stated:

> And, like I said, you know, I can't recall everything for sure.  I know they
> have no idea what it was.  I know they have no idea–I never said that, "This is
> making me go, 'Oh, he's guilty or not guilty.'"
> It was just one of those moments where I was, "Oh, I just got to get this
> out of my mind."  And I just spoke out loud–which, of course, in recollect, you
> wish  you never did. But I was like, "I wish I could just get this thing out of my
> head."

*Id.*  at 11-12.  She continued, "It was kind of like, you know, "Oh this just sucks.  We have these

things and I have this thing in my head that I overheard in the elevator and I wish it wasn't

there." *Id.* at 13.  She also stated that she made this statement when they were "at the, you know,

standstill."  *Id.* at 14.  She noted she wished "this was not put in my head."  *Id.*  at 15.  Finally,

---

[9]That day  would have been the 17th of December–the day they deadlocked.

she also stated unequivocally that she did not say that what she had heard helped her render her verdict. *Id.*

Jurors No. 2nd Juror No. 3 had no recollection of Juror No. 1 saying anything about a comment overheard in the elevator. (*Id.* at 18 and at 20 respectively).

Juror No. 4 testified that she remembered Juror No. 1 saying that she had heard something outside the courtroom. (*Id.* at 22). This juror did not remember when Juror No. 1 made the statement, but that when she tried to say something, the jury told her not to say anymore and that they did not want to hear any more. *Id.* at 23-24.

Juror No. 5 heard nothing about any of these statements. (*Id*. 26-27).

Juror No. 6, the juror who had signed an affidavit in this regard, testified as follows:

> The room was quiet and she spoke up and said, "I've been debating on whether or not I would bring this up or not," and that got our attention, so we listened to her.
> And she said, "I was standing in the elevator with my juror tag on and, you know, in display, minding my own business and I overheard something in the elevator and I was debating on whether or not I should share this with you because it helps me"–"it's going to help me not lose any sleep at night over convict–you know, voting guilty."

*Id.* at 30. Juror No. 6 testified that it was after they had deadlocked, either right before they went home on the second day of deliberation or the morning of the verdict being reached, and confirmed that the jury did not allow her to repeat what she had heard. *Id.* at 30. Juror No. 6 also stated that they did not apprise the Court about the statement because "she didn't say what it was,  I was – I was bothered by it, but I figured we didn't know what she said, so we stopped anything from coming in." *Id.* at 31.

Juror No. 7 testified that Juror No. 1:

> said she had heard something in the elevator.  That was after the initial
> poll that—the initial vote saying guilty or not guilty.  And she did hear something,
> and I was the one that urged her not to say anything to the other jurors about what
> she had heard in the elevator.

*Id.* at 33.  On further questioning, Juror No. 7 continued, "She did mention something that she

did hear something that would–that made her–I don't know–she had pretty much already made

her decision . . . ." *Id.* at 34.   While he could not state exactly what she said, he agreed that it

was something to the effect that she was given a little more comfort about her vote.  *Id.* at 35.


Juror No. 8 also testified that Juror No. 1 made "a comment that they (sic) heard

something outside of the courtroom."  *Id*. at 37.  He testified, "I think it was the final day of

deliberations, or maybe the day before, she said that she had heard something that had solidified

her judgment and made her decide it was guilty, and she asked if we wanted to hear it and

everybody said no." *Id.* at 37.  He later stated that this occurrence happened after they had

deadlocked.  *Id.*

Juror No. 9 likewise recalled Juror No. 1 making a statement to the effect that Juror No. 1

had heard something outside of the courtroom that as a result that juror would not lose any sleep

over a guilty verdict as to Count 1.  *Id.* at 39.  Juror No. 9 then testified that to the best of her

recollection concerning what Juror No. 1 had said about what she had overheard:

> Juror No. 9:     [S]he had overheard a conversation, that her juror
>                  badge was covered by her scarf so the people in the
>                  elevator did not know that she was a juror.  And she
>                  said, "I don't know if I should bring this up," and
>                  we, the best of my recollection–I know I said "Then
>                  don't.  Do not say it.  I don't want to know what you
>                  heard."

| The Court: | Did she say anything about what she heard giving her some comfort or solace in her vote for guilty? |
|---|---|
| Juror No. 9: | I think she said that–I don't remember the exact wording. |
| The Court: | But the tenor of– |
| Juror No. 9: | The tenor was:  To explain why I feel I should vote this way, I heard–overheard something in the elevator. |
| The Court: | Did you get from that that it gave affirmation to the way she was leaning? |
| Juror No. 9: | At that time, yes. |

*Id.* at 40.  These statements were made after the jury had deadlocked.  At the end of her testimony, Juror No. 9 agreed that she had some recollection of her saying that in some way the outside information gave Juror No. 1 comfort.  *Id.* at 41.

Juror No. 10, who was the subject of Mr. Marshall's affidavit, agreed under oath that Juror No. 1 had made a statement to the effect that she had heard something outside of the courtroom that as a result that juror would not lose any sleep.  Specifically, Juror No. 10 testified:

| Juror No. 10: | All right.  Basically, what she said was she overheard something in the elevator–I don't' know if she ever told us who was in the elevator with her–and it reaffirmed why she voted guilty.  And she actually started to–she was going to tell us what it was, but then several of us told her not to. |
|---|---|
| The Court: | At what point in your deliberations was this? |
| Juror No. 10: | I'd say maybe mid-way or three-quarter of the way. |
| The Court: | Had you already given the Court a deadlock note or not? |
| Juror No. 10: | I think we actually–I'm not 100 percent on it, but I would say, yes, we did. |

The Court:      Did she elaborate any further about that other than what you've said?

Juror No. 10:   No.  And everyone said, "Don't say anything.  It's not evidence."

The Court:      And can you just–so she did not say what she
                overheard, but she told you the effect upon her on
                her overhearing that, and "told you," told the jury?

Juror No. 10:   Yes.

The Court:      Was the whole jury there in the room?

Juror No. 10:   Yes.

The Court:      And could you, one more time, give me your best
                recollection of what she said, not about her
                overhearing something in the elevator, but the effect
                it had upon her?

Juror No. 10:   I'm pretty sure she said it reaffirmed why she voted guilty.

*Id.* at 44-45.

Juror No. 11 had no recollection of hearing anything of this nature. *Id.* at 47.

Juror No. 12  testified that Juror No. 1 told the jury that she had heard something in the elevator, but the juror head nothing else.  Juror No. 12 stated, "I didn't want to hear anything." *Id.* at 50.  This juror thought the statement might have been made after a verdict was reached, but was not certain.

Thus, in the aggregate, the jurors recollection of Juror No. 1's statements are as follows:

13

| Juror No. | No. 1 Heard Something Outside and told jury she had heard something | No. 1 said it would give her comfort in voting guilty | It happened after deadlock |
|---|---|---|---|
| 1 | yes | no | yes: day we were there all day–day of deadlock |
| 2 | no | | |
| 3 | no | | |
| 4 | yes | no | no recollection |
| 5 | no | | |
| 6 | yes | yes | yes: after deadlock |
| 7 | yes | yes | yes: after first polling |
| 8 | yes | yes | yes: after deadlock |
| 9 | yes | yes | yes: after deadlock |
| 10 | yes | yes | yes: after deadlock |
| 11 | no | | |
| 12 | yes | no | no: unsure; after verdict |

Thus, based on the testimony adduced at the hearing the Court finds that:

(a)    Juror No. 1 stated to the jury that she had heard information outside of the courtroom that influenced her and gave her comfort in reaching a guilty verdict.

(b)    Juror No. 1 injected this extraneous information into the jury deliberations.

(c)    This action was done in contravention of the Court's instructions.

(d)    This action was done at a critical time in the deliberations that is after the jury had deadlocked.

(e)    The jury further failed to head the Court's instructions in that after this information was imparted to the jury, the jury failed to inform the Court of its occurrence.

14

These findings are based on at least five jurors testifying that Juror No. 1 had stated that she had heard some discussion outside of the Courtroom that gave her comfort in rendering a guilty verdict.  To that end, Juror No. 1's credibility is certainly called into question.

Thus, the Court has before it both the non-stricken materials in the affidavits presented with the instant motion and the record of the Court's interview of the jurors.  With this factual background, the Court must now determine whether the method by which Mix's counsel obtained this information and its substance renders all or some part of it prohibited from being considered with respect to the instant motion.

## II.      Analysis

### A.      Violations of the Law and Local Rules

The Court will first review the law with respect to juror interviews and the effect of running afoul of those rules.  While the Court has already stricken those portions of the affidavits which were found to contain information prohibited under Fed. R. Evid. 606(b), a review of that rule is the proper starting point for the Court's analysis.

#### 1.  Rule 606(b)

Federal Rule of Evidence 606(b) provides:

**(b) During an Inquiry Into the Validity of a Verdict or Indictment.**

> **(1) Prohibited Testimony or Other Evidence.**  During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment.  The court may not receive a juror's affidavit or evidence of a juror's statement on these matter.

> **(2)  Exceptions**. A juror may testify about whether:

**(A)**  extraneous prejudicial information was improperly brought to the jury's attention;

**(B)**  an outside influence was improperly brought to bear on any juror; or

**(C)** a mistake was made in entering the verdict on the verdict form.

The United States Supreme Court explained in detail the reasoning and long history of this procedural rule in *Tanner v. United States*, 483 U.S 107 (1987).  In *Tanner*, before two defendants were sentenced, they filed a motion seeking permission to interview jurors, an evidentiary hearing and a new trial.  One defendant's counsel had received an unsolicited telephone call from one of the trial jurors during which she informed counsel that several of the jurors consumed alcohol during the lunch breaks causing them to sleep through the afternoons. *Id.* at 113.  At a subsequent hearing, the district court concluded that this testimony on intoxication was inadmissible under Fed. R. Evid. 606(b) to impeach the jury's verdict.  Instead, the Court then allowed the defendants to call non-jurors to testify; however, the court was not convinced.  Moreover, to the extent that jurors had possibly fallen asleep, the court had instructed counsel twice that if they observed jurors being inattentive, they should inform the court, and the judge would take remedial action. The Court denied the motion for leave to interview jurors, for an evidentiary hearing and a new trial. *Id.* at 115.

While the matter was on appeal, defendant's counsel received an unsolicited visit at his residence from another juror.  Despite the district court's prior ruling, the attorney arranged for two private investigators to interview that juror under oath and transcribed.  That juror testified that four jurors had consumed a pitcher to three pitchers of beer during various recesses as well as having smoked marijuana and used cocaine.  The district court again denied a motion for new trial and the Eleventh Circuit affirmed.

16

The defendants maintained that they had been deprived of their Sixth Amendment right to trial by a competent jury and sought a reversal in the Supreme Court.  However, the appellate court found that since the beginning of the twentieth century, if not earlier, there was a near-universal and firmly established common-law rule in the United States flatly prohibiting the admission of juror testimony to impeach a jury verdict.  *Id.* at 117.  "Exceptions to that common-law rule were recognized only in situations in which an 'extraneous influence,' *Mattox v. United States,*, 146 U.S. 140, 149, 13 S.Ct. 50, 53, 36 L.Ed. 917 (1892), was alleged to have affected the jury."  In *Mattox*, juror testified how they heard and read prejudicial information not admitted into evidence.  In other instances, the court allowed juror testimony where a bailiff made derogatory comments concerning the defendant, *Parker v. Gladden*, 385 U.S. 363, 365 (1966), or where there had been attempts at bribery, *Remmer v. United States*, 347 U.S. 227-228-230 (1954).

Clearly, in the case at bar, the information that has been previously stricken from the record by the Court fits the rule discussed in *Tanner*. Moreover, as previously noted, after the trial, in open court, the undersigned specifically instructed **the jurors** that "under no circumstances, except by court order, not to disclose **any information concerning the deliberations of the jury or for the purpose of obtaining evidence of improprieties in the jury's deliberations.**"  Regardless of defense counsel's protestations that these instructions were not to counsel but to the jurors, as officers of the Court, there is no room for that kind of parsing. By (1) allowing Juror No. 6 not only to talk about deliberations, but (2) have her come to counsel's office to swear out an affidavit precisely about that which she was instructed to remain

silent is beyond the pale.  Likewise, it is clear by counsel's own affidavit that he engaged in a conversation with Juror No. 10 which included prohibited information.

Nonetheless, the fact (1) that Juror No. 1 heard extraneous information which she stated had influenced her vote of guilty, (2) which fact she informed the rest of the jury after the jury deadlocked, as well as (3) the effect of her statements on the other jurors in light of the verdict being entered soon after, raises a more problematic issue.  Clearly, a defendant is entitled to a jury that has not been influenced by materials that have not been admitted into evidence.  However, the manner in which this disturbing information was mined, that is that counsel contacted the jurors without leave of court and without judicial oversight, creates another layer of issues.  Clearly, these interviews were inappropriate and contrary to the law of this district and circuit.

### 2.    Local Rule 45.7 Interviewing Jurors

This Court has in effect Local Civil Rules and Local Criminal Rules.  While the criminal rules are silent with regard to juror interviews, it is the custom of this Court to look to the civil rules as well, particularly in the area of juror interviews.  Local Rule 45.7 provides the parameters for juror's interaction with those who seek to discuss the case after trial.  The rule states that:

(A)    A juror has no obligation to speak to any person about any case and may refuse all interviews or comments.

(B)    No person may make repeated requests to interview or question a juror after the juror has expressed a desire not to be interviewed.

(C)    **Except by leave of court granted upon motion for good cause shown, no attorney or party to an action or anyone acting on their behalf may**

**examine or interview any juror.**  Any juror who consents to be interviewed must not disclose any information concerning:

(1)	The specific vote of any juror other than the juror being interviewed;

(2)	The jury deliberations; or

(3)	Evidence of improprieties in the jury's deliberations, except as to whether (a) extraneous prejudicial information was improperly brought to the juror's attention; (b) any outside influence was improperly brought to bear upon any juror; or (c) there was a clerical mistake in entering the verdict on the verdict form.

L.R. 45.7.  Mix's counsel makes much of the fact that this rule is not contained in the criminal local rules, and thus they were not on notice that they could not interview the jurors to find out subjective information about "how they did" as trial lawyers.  This argument serves as a counterweight in a later determination; however, the Court wants to make clear that it finds defense counsel's arguments somewhat dissembling.

As noted, a quick Westlaw search would have demonstrated that clearly the undersigned has used the LR45.7 in a criminal context and indeed did not allow the interview sought.  *United States v. Smith*, 2000 WL 257459 (E.D.La. March 2, 2000).   Another example of the Eastern District of Louisiana use of it Local Civil Rules in the context of criminal litigation is Local Civil Rule 83.2 concerning attorney conduct. Reliance on this local civil rule is used throughout this district. *See United States v. Holmes,* 2010 WL 2733323, at *3 (E.D.La. July 8, 2010)(Duval, J.)( applying Local Civil Rule 83.2.11); *United States v. DeCay*, 406 F.Supp.2d 679, 683 (E.D.La. 2005)(Barbier, J)(L.R. 83.2); *United States v. Bowen,* 2011 WL 1980281 (E.D.La. May 20, 2011) (Engelhardt, J.) (applying Local Civil Rule 83.2.3).

Notwithstanding the applicability of that local rule, it is equally clear that post-verdict questioning of jurors is disfavored in the Fifth Circuit in the context of a criminal trial. In *United*

*States v. Booker,* 334 F.3d 406 (5th Cir. 2003), where no mention is made of any applicable local

rule, the appellate court affirmed a trial court's decision to deny an attorney's request for post-

trial interviews of jurors as there was no showing of illegal or prejudicial intrusion into the jury

process. *Id.* at 416.  In another instance, the Fifth Circuit rejected a claim of error because a

district judge did not allow jurors to be interviewed after the criminal defendant's counsel

received a call from one of the jurors indicating that the verdict was "not truly his own and

stating that at least two other jurors felt the same way."  *United States v. Varela-Andujo*, 746

F.2d 1046, 1049 (5th Cir. 1984).  The Fifth Circuit stated:

> Since in Texas post-trial interviews of jurors are the norm rather than the
> exception, it may be difficult for Texas lawyers to accept the well-established
> **federal rule that prohibits post-verdict interviews of jurors.**  *United States v.*
> *Davila,* 704 F.2d 749, 754 (5th Cir. 1983).  Only where there is a showing of
> illegal or prejudicial intrusion into the jury process will the court sanction such an
> inquiry.  *United States v. Riley,* 544 F.2d 237, 242 (5th Cir. 1976), *cert. denied*,
> 430 U.S. 932, 97 S.Ct. 1554, 51 L.Ed.2d. 777 (1977).

*Id.*  This "Texan mind set," however, would not likely be shared by lead counsel, because in the

First Circuit, where lead counsel practices  (as previously noted), there is an **absolute**

**prohibition** of such interviews without leave of court and for good cause shown.  *United States*

*v. Kepreos*, 759 F.2d 961, 967 (1st Cir. 1985) ("[H]enceforth this Circuit prohibits the post-

verdict interview of jurors by counsel, litigants or their agents except under the supervision of

the district court, and then only in such extraordinary situations as are deemed appropriate.")

In another albeit civil case where no mention of a local rule is made, Judge Rubin

penned:

> "historically, interrogations of jurors have not been favored by federal courts
> except when there is some *showing* of illegal or prejudicial intrusion into the jury
> process."  *O'Rear v. Frueharuf Corp.*, 554 F.2d 1304, 1309 (5th Cir. 1977)
> (emphasis in original); *United States v. Riley,* 544 F2d 237, 242 (5th Cir 1976),

> *cert. denied*, 430 U.S. 932, 97 S.Ct.1554, 51 L.Ed.2d 777 (19770; *accord Martinez v. Food City, Inc.* 658 F.2d 369, 373, n.2 (5th Cir. 1981) (dictum).  We have required a showing of "specific instances of misconduct" before allowing the parties to conduct such an inquiry.  *O'Rear*, 554 F.2d at 1309-10; *Riley,* 544 F.2d at 242.
>
>       In *O'Rear*, we reviewed the "very cogent reasons" for requiring parties to make a showing of likely misconduct before allowing such an inquiry:  Protecting the jury from post–verdict misconduct and the courts form time-consuming and futile proceedings; reducing the "chances and temptations" for tampering with the jury; and increasing the certainty of civil verdicts.  544 F.2d at 1310 n. 4.  We continue to decline to "denigrate jury trials by afterwards ransacking the jurors in search of some ground . . . for a new trial" unless a preliminary showing is made.  544 F2d at 1310.

*Wilkerson v. Amco Corp.*, 703 F.2d 184, 186-87 (5th Cir. 1983).  *See also Haeberle v. Texas Inter'l Airlines*, 739 F.2d 1019 (5th Cir. 1984) (Rubin, J) (local rule addressed juror interview noting that same is not favored).   Thus, where it is clear from the case law that the practice in the Fifth Circuit is for leave of court to be requested before interviews occur, how counsel could presume leave of court would not be required in the context of a criminal trial where the constitutional safeguards are so stringent is curious.

Moreover, according to at least two other circuits, even absent such a local rule, "it is well settled that district courts have the power to make rules and issue orders [in criminal cases] prohibiting attorneys and parties from contacting jurors, whether directly or indirectly, absent prior court approval." *United States v. Venske*, 296 F.3d 1284, 1291 (11th Cir. 2002); *accord United States v. Wright*, 506 F.3d 1293, 1303 (10th Cir. 2007) ("District courts have 'wide discretion' to restrict contact with jurors to protect jurors from 'fishing expeditions' by losing attorneys." (quoting *Journal Publ'g Co. v. Mechem*, 801 F.2d 1233, 1236 (10th Cir. 1986))).

Finally, in this regard, the Court is confounded by the short-sightedness of counsel.  Clearly the kind of contact with jurors counsel employed, without any recording of the

discussion, without any court supervision, without any kind of competent record of exactly what was asked of the jurors and the follow-up questions which elicited the information that was contained in the two affidavits presented so taints that information from an evidentiary standpoint that the Court has concerns with respect to relying on this information based on these infirmities.

### 3.  Violation of the Court's Directives

As noted, counsel specifically allowed and in essence "aided and abetted" the jurors in disobeying the Court's absolute prohibition concerning a discussion of the deliberations of the jurors to obtain evidence of improprieties in the jury's deliberations.  To begin, to contact the jury without leave of court invited problems.  As soon as Juror No. 6 spoke of the deliberations, the conversation should have been steered back to the issue of "what went wrong" which was counsel's ostensible justification for this contact.  Disregarding these defalcations, once there was any indication that there had been the injection of extraneous information into the jury deliberations, counsel should have stopped the discussion, immediately contacted the Court and requested its guidance.  Clearly, it would have been in the best interest of counsel's client rather than what can only be viewed as "zealous" representation run amok.  The fact that counsel took fourteen days to prepare a motion based on this information and never apprised the Court is astounding.

Thus, the Court now must grapple with the issue of whether the defalcations of counsel should be visited upon the defendant.

22

**B.  Do Such Violations Require the Court to Disregard the Juror Declarations?**

The United States maintains that these violations require the Court to disregard the juror declarations and deny the defendant's motion.  The Government points to *United States v. Venske*, 296 F.3d 1284 (M.D. Fla. 2002), where the affidavit of a private investigator alleging bailiff's extrinsic influence on jurors was excluded from evidentiary hearing concerning juror misconduct where the local rule specifically prohibited juror interviews without  prior leave of Court.[10]  Likewise, in *Cuevas v.  United States,* 317 F.3d 751 , 753 (7th Cir.  2003), the Seventh Circuit affirmed a district court's decision to exclude evidence from post-trial juror interviews obtained in violation of local rule prohibiting same.  Thus, it is clear that "[i]f a juror's affidavit submitted in support of a new trial motion was obtained in clear violation of a court order or local rule against interrogation of jurors, then the court may disregard that affidavit."  *United States v.  Siegelman*, 467 F.  Supp.2d 1253, 1270 (M.D. Ala.  2006).  In these cases, there was a specific local rule addressing in the criminal context the prohibition against the interviewing of jurors.

Counsel for Mix maintains that they did nothing improper given that there are American Bar Association Information Opinions from 1962 and 1967 that state  that as a matter of self-education, a lawyer may interview jurors if it is not illegal.  Because United States District Court for the Eastern District of Louisiana criminal local rules are silent on the matter, and the only rule that specifically addresses juror interviews is civil, defense counsel maintains that leave was not required in this **criminal** case.   Counsel reasons that a criminal defendant has a right to be tried by an impartial jury under the Sixth Amendment, and cites a number of other jurisdictions

---

[10]  It appears that those local rules specifically applied to both civil and criminal matters.

demonstrating the various approaches to juror contact.  Moreover, Mix's counsel maintains that "when a district court intends for a local civil rule to apply to criminal proceedings, it says so explicitly" again citing other jurisdictions.

Instead of informing the court immediately upon learning of the extraneous information, Mix's counsel insist they "undertook to confirm and present the 'elevator comment' to the Court in as expeditious and professional manner as possible," and they were "constrained by multiple obligations."  They offer as an explanation for the delay that: (1) they  had to comply with the Federal  Rules of  Criminal  Procedure, the Local Criminal Rules of Eastern District of Louisiana and any Orders issued by the Court; (2) they had a duty to "zealously protect Mr. Mix's Sixth Amendment rights and make all meritorious arguments on his behalf; and (3) they had a "professional responsibility to confirm that the information was credible and provide the information to the Court in some concrete, reliable form."  (Doc. 724 at 8 of 11).

In addition, Mix's counsel relies on Fed. R. Cr. P. 57(b) which concerns district court's adoption of local rules in general,  provides:

> (b) **Procedure When There is No Controlling Law.**  A judge may regulate practice in any manner consistent with federal law, these rules, and the local rules of the district.  No sanction or other disadvantage may be imposed for noncompliance with any requirement not in federal law, federal rules, or the local district rules unless the alleged violator was furnished with actual notice of the requirement before the non-compliance.

*Id.*  Counsel contends that this rule makes clear that, under these circumstances, Mr. Mix cannot be disadvantaged with respect to his Sixth Amendment Claim.   Moreover, counsel relies on this rule to opine that because there was no applicable Local Criminal Rule, they cannot be sanctioned.  *Amnesty Am v.  Town of W.  Hartford*, 288 F.3d 467, 471-72 (2d Cir.  2002) (Fed.

Civ. R.  Pro. 83(b) (analogue to Fed.  R.  Crim.  P. 57(b) failure to comply not sanctionable where local rule was ambiguous).

  Pretermitting of these concerns of counsel's defalcations, the Court must now determine how to reconcile the two countervailing tensions–the duty to protect the jury process from improper contact and the duty to insure that Kurt Mix received a fair trial by an impartial jury as guaranteed by the Sixth Amendment.  Because it is clear that Juror No. 1 brought outside information into the jury room at a critical juncture in the proceeding which clearly influenced her and gave her comfort in reaching a guilty verdict, because she did so in contravention of the Court's distinct instructions, because this mistake was exacerbated when the jury failed to inform the Court at the time of the defalcation that it occurred, because this occurred **after** the jury was deadlocked and a verdict was reached in essence two deliberative hours thereafter, the Court will rely solely on the testimony adduced at the hearing to make its determination as to whether Mr. Mix is entitled to a new trial.

  While the Government argues even the testimony adduced at the Court's hearing is the "fruit of the poisonous tree" due to counsel's interviewing of jurors without leave of Court and likewise should not be considered, to disregard all of the testimony would ignore the guidance provided in *Tanner, Venske, Cuevas,* and *Siegelman*.  Clearly, as was done in *Siegelman,* the Court  may disregard the improperly obtained material and conducted its own, properly tailored inquiry.  Moreover, the statements from the jurors elicited and upon which this decision rests are within the purview of the exceptions set forth in Fed. R. Evid. 606(b).  Thus, it appears to the Court that the proper balance between the tension to preserve the integrity of the jury system and the tension for a criminal defendant to obtain a fair trial based on the evidence presented in the

courtroom requires the Court to rely on the testimony adduced at the hearing and ignore the affidavits that accompanied this motion.  And so the Court now turns to the merits of Mix's Motion for New Trial.

### III.      The Infusion of Extraneous Material Mandate a New Trial

"'A defendant is entitled to 'a fair trial by an impartial jury which will render its verdict based upon the evidence and arguments presented in court without being influenced by outside irrelevant sources.'"  *United States v.  O'Keefe*, 722 F.2d 1175, 1197 (5th Cir.  1983), citing *United States v. Chagra*, 669 F.2d 241, 249 (5th Cir.), *cert. denied,* 459 U.S. 846, 103 S.Ct. 102, 74 L.Ed.2d 92 (1982).   "Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen."*Smith v. Phillips*, 455 U.S. 209, 217 (1982).

Indeed, in any trial there is initially a presumption of jury impartiality."  *O'Keefe* 722 F.2d at 1197.  However, the presumption may be attacked and prejudice may be shown by evidence that extrinsic factual matter tainted the jury's deliberations.  *United States v. Smith,* 354 F.3d 390, 394 (5th Cir. 2003); *United States v. Ruggerio*, 56 F.3d 647, 653 (5th Cir.  1995). When a colorable showing of extrinsic influence appears, a court must investigate the asserted impropriety.  *United States v. Diaz*, 498Fed. Appx. 407, 415,  2012 WL 5910944, **6 (5th Cir. 2012)  citing *Ruggerio,* 56 F.3d at 652 citing, *United States v. Winkel*, 587 F2d , 705, 714 (5th Cir.  ), *cert.  denied,* 444 U.S. 827 1979).

In making its determination,  the trial court:

> must first assess the severity of the suspected intrusion; only when the court
> determines that prejudice is likely should the government be required to prove its
> absence. . . . As stated in [*United States v.*] *Olano*, 507 U.S. at 739, 113 S.Ct. at
> 1780-81, regardless of whether the presumption arises, the court's "ultimate
> inquiry" must be whether the intrusion will affect the jury's deliberations and
> verdict.

*United States v. Sylvester*, 143 F.3d 923, 934 (5th Cir. 1998) (noting that previous standard of

*United States v. Luffred*, 911 F.2d 1011, 1014 (5th Cir. 1990), that any exposure was

presumptively prejudicial and government had burden of proof that exposure was harmless has

been modified). *See United States v. Garcia*, 334 Fed.Appx. 609, 615 n.21, 2009 WL 1577828,

(5th Cir. 2009).

In this case, based on the testimony adduced from the Court interviewing of the jury,

Juror No. 1 was exposed to extraneous information.   She struggled with that information.  She

failed to inform the Court that she had heard that extraneous information which prevented the

Court from addressing this circumstance in a timely manner.  By her own testimony at the

evidentiary hearing, she opined that the extraneous information bothered her and she was unable

to get it out of her mind.  Moreover, it is clear by virtue of that testimony that she was unable to

follow the Court's instruction to consider only the evidence presented in Court.  Thus, the

Government's argument that its effect was harmless because of the Court's instructions to her to

ignore outside information lacks merit.  Given these facts, the Court finds that her deliberations

and verdict were probably tainted and present an objectively reasonable possibility of prejudice.

*Siegelman*, 467 F.2d at1274.

The Court would note that this analysis has no taint of a violation of Fed. R. Evid.

606(b).  This information was obtained directly through a properly conducted hearing that the

Court found necessary.  Moreover, the instigation of that inquiry was necessitated by the fact

that its trigger had to do with Juror No. 1's obsession with outside information and her failure to follow the instructions of the Court, that is that she was instructed to ignore any information that was not presented in trial.  These facts open the question as to the competency and fairness of the verdict just as a result of her own failings.

Juror No. 1 then polluted the jury with her statements at a critical juncture–that is after the jury had deadlocked.  A verdict was then returned after two more hours of deliberations in the jury room.   Five jurors testified that Juror No. 1 had made statements concerning the extraneous comment which rendered Juror No. 1 comfortable with finding the defendant guilty. This information was imparted by the very person entrusted with the important role of foreperson, which by virtue of her leadership role, increased the prejudicial nature of her outburst.   This defalcation is exacerbated by her not having told them exactly what she heard only that she felt comfortable with a guilty verdict; the other jurors could likely have been unduly influenced by her vouchsafing.  Moreover, given the timing of her statement, it appears likely to the Court objectively that her statements were made **specifically to influence the outcome of the decision**.  There is no more likely explanation for it having been made at that time under those circumstances.  Finally, the failure of the jury to apprise the Court of this circumstance likewise puts at issue the jury's ability to actually follow the Court's instructions as well.  As such, the Court finds that these facts demonstrate objectively that Juror No. 1's statements likely affected the jury's deliberations and verdict.

Federal Rule of Civil Procedure 33 provides that a court "may vacate any judgment and grant a new trial if the interest of justice so requires."  These extreme circumstances  place the very sanctity of the impartial nature of Mix's jury at issue .  As such, the Court finds that  based

on these facts, Mr. Mix was not tried by an impartial jury; it did not render its verdict based upon the solely on the evidence and arguments presented in court; there were outside irrelevant sources at play that likely affected the jury's deliberations and verdict, and as a result, Mr. Mix is entitled to a new trial.          Accordingly,

**IT IS ORDERED** Kurt Mix's Rule 33 Motion for an Order Vacating the Jury's Verdict and Granting a New Trial Due to Juror Misconduct. (Doc. 706) is **GRANTED**.

**IT IS FURTHER ORDERED** that the Order of January 14, 2014 (Doc. 717) and the Order of January 27, 2014 (Doc. 726) are hereby **UNSEALED.**

New Orleans, Louisiana, this  12th day of June, 2014.

_____
                    **STANWOOD R.  DUVAL, JR.**
            **UNITED STATES DISTRICT COURT JUDGE**